STATE OF NEBRASKA, APPELLANT, V.
VERMA J. HARRISON, APPELLEE.
588 N.W. 2d 556

Filed January 22, 1999.    No. S-97-1152.

Paul B. Schaub, Cheyenne County Attorney, for appellant.

James R. Mowbray, of Nebraska Commission on Public Advocacy, and, on brief, Robin W. Hadfield for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ., and WITTHOFF, D.J.

CONNOLLY, J.

The appellee, Verma J. Harrison, was convicted of two counts of motor vehicle homicide and sentenced to consecutive terms of probation by the district court. The Nebraska Court of Appeals reversed Harrison's sentences as excessively lenient, pursuant to Neb. Rev. Stat. § 29-2322 (Reissue 1995), and imposed consecutive sentences of imprisonment. *State v. Harrison*, 7 Neb. App. 350, 583 N.W.2d 62 (1998). We reverse the judgment of the Court of Appeals, concluding that the trial court did not abuse its discretion in imposing probation.

## BACKGROUND

### COLLISION

Harrison was driving a GMC van on Interstate 80, near Sidney, Nebraska, at approximately 7:30 a.m. when the van she was driving collided with a Chrysler Town and Country van being driven by Joseph Nicolich, age 65. Joseph Nicolich's wife, Janice, age 60, was in the front passenger seat, and their granddaughter, Robyn Griffiths, age 11, was in the rear seat. The impact of the collision killed Robyn and Janice.

A Nebraska State Patrol officer determined that Harrison was intoxicated at the time of the collision. Harrison stated that she had been drinking in Ogallala until about 3 a.m., had slept a couple of hours in a motel, and was in a hurry to get to Cheyenne, Wyoming. Six motels located at the Ogallala interchange were contacted, and none had any record of Harrison's being registered on the relevant date.

Joseph Nicolich stated that at the time of the collision, he was traveling on I-80 and had passed a motorist who was stopped on the side of the road. He decided to pull over to offer assistance. He had pulled onto the shoulder and slowed down to approximately 25 miles per hour, when his vehicle was struck in the rear by Harrison's vehicle. According to an accident reconstructionist, Harrison was driving on the shoulder at the time of impact at a speed of approximately 65 to 75 miles per hour. It appeared that Harrison made no attempt to avoid the collision. Harrison stated that she thought she had fallen asleep at the wheel.

### ARRAIGNMENT

Harrison was charged with two counts of motor vehicle homicide, pursuant to Neb. Rev. Stat. § 28-306(1) (Reissue 1995), for allegedly causing the deaths of Janice and Robyn, unintentionally, while engaged in the operation of a motor vehicle. Harrison pled guilty in the district court to both counts after being informed of her rights by the court. The State recited the factual basis for the charges, which Harrison admitted. The trial court found that Harrison had freely, intelligently, and voluntarily entered each plea and accepted them. The trial court then ordered a presentence investigation.

## SENTENCING

Because we are faced with a sentencing issue, we will discuss the facts contained in the presentence report and those presented at the sentencing hearing in some detail.

The presentence report indicates that Harrison's life had been filled with abuse. Her father, who had been a uranium miner, died from lung cancer in 1971. After her father died, her mother had an affair with Harrison's married uncle, who also molested Harrison and her sister. The community later discovered her mother's adulterous relationship, and their family became outcasts. Harrison married an alcoholic in 1988 when she became pregnant, and she was divorced in 1994. Two of Harrison's children were from this marriage. The other child was the result of a relationship with a man who physically abused Harrison. Harrison was 32 years old at the time of sentencing.

Harrison was convicted of public intoxication in 1994 and driving under the influence of alcohol in 1995. Harrison participated in an 8-hour alcohol abuse course as a result of her 1995 conviction, but did not complete it. She had been fined for child neglect in 1992, which was also attributable to alcohol. Harrison began drinking regularly at age 15 and was drinking twice a week by her senior year in high school.

The presentence report contained numerous letters, some in support of and some in opposition to Harrison's receiving the maximum sentence. The letters in support of Harrison's receiving the maximum sentence were adequately characterized by the trial court during the pronouncement of sentence, which statement is set forth below. The letters in support of Harrison's receiving probation, particularly those from the director of the Laramie Head Start Program, the principal of the elementary school attended by Harrison's children, the pastor of Harrison's church, and a counselor and instructor for the AAA DUI Offender Program, indicated that Harrison was a responsible parent, was heavily involved in the community, and was making significant progress toward conquering her alcoholism. According to these letters, Harrison's attempt at rehabilitation was sincere and was likely to be successful.

At the sentencing hearing, the trial court asked Harrison whether she had anything she wanted to say. Harrison stated:

Yes, I would like to tell everybody in this courtroom today and say that there is [sic] no words for the depth of the remorse that I feel. The depth of the remorse that I feel, and I will never forget and I won't, Your Honor, for the rest of my life. I have learned so many valuable lessons in this whole thing. For the rest of my life I dedicate myself to my sobriety and then to helping others who are headed down the same way, because I never intended to hurt anybody.

Joseph Nicolich testified on behalf of the State:

I would like to say that I hope Verma Harrison receives the maximum jail time or prison time with no good time off for good behavior or probation.

. . . .

I would think that now Mrs. Harrison is trying to show the authorities how good she can morally and religiously be. I feel she would shake hands or marry the devil if it meant her getting off the charges against her.

The trial court also had before it a letter handwritten by Cindy Griffiths, Robyn's mother, at the mother's request:

October 7, 1997

Dear Justice Knapp,

My name is Cindy Griffiths, my husband's name is Bill Griffiths. We are the parents of Robyn Griffiths (DOB 12/12/84) and the daughter and son-in-law of Janice Nicolich. Robyn and my mother, Janice, were brought to their deaths while driving through Sidney on June 28, 1996. My father, Joe Nicolich, was there too, as he was the driver.

I am writing to you today in regards to Verma Harrison, who was driving the vehicle that crashed into my parents' car on I 80. I understand her sentencing date is approaching quickly, and we wanted to let you know our thoughts.

It's a little hard for me to know where to begin. To try to describe the agony of losing our precious daughter and mother is not something we can easily do, for the pain runs so very deep. It's beyond anything we've ever experienced. It's as though a major tidal wave—a tsu nami—has crashed down upon us and sent us tumbling and spinning in blackness—agonizing blackness. I described it at one

point to someone as being tortured unceasingly without the repose of death. I prayed and asked God a number of times to just please, please take my entire family in our sleep so we wouldn't have to live the nightmare anymore. Obviously my prayers have gone unanswered—this time—and for good reasons, I'm confident.

My daughter, Robyn, who was born on my birthday nearly 13 years ago, is the second of six children and the first of two girls (my youngest, now five yrs. old, is a girl). She was—it is difficult to write "was" when referring to her—but she was a very special young lady who graced the lives of many with her gentle, caring spirit. She was mature for her 11½ years: helping with household duties and with caring for the little ones. She'd intervene when her brothers didn't get along and she helped to create an atmosphere of peace. She'd offer comfort to a sibling who felt misunderstood. And she'd be found every day playing mom to her baby sister (who was three at [the] time we lost Robyn) by playing with her, reading her stories and the like. In our family of six children we teach the older ones to help with and care for the younger children. Robyn rarely complained. In fact, there was little else she preferred over spending time with her baby sister. All of her siblings loved her dearly, so naturally they suffer—unnaturally. We suffer because we love. I've told them this. It hurts so much because we loved so much, and we still love so much.

The shock of my daughter's sudden and violent death has reverberated throughout our families and our local and church communities. Robyn had several close friendships, but we've learned that a large number of girls considered her to be their "best" friend. She had a very loving way about her that caused her to seek to include others, especially the ones that were shy or on the peripheral. And Robyn and I were very close. I am not going to describe my relationship with her except to say that I don't think it gets any better than what we had.

I have to admit that I am tempted to go on and on about this child because I cannot see her sweet freckled face any

longer. My eyes are now denied their maternal right to watch the sunlight dance on the blonde highlights of her brown hair, or the wind tease her flowing locks. I cannot feel her in my arms any longer, yet I remember her soft skin and wonderful hugs. I do not hear her playing with her brothers and sister, and our piano seems to sit in a sullen silence, wondering why her gentle songs have ceased. Where other moms can talk to their 12 yr. old daughters, I now can only talk about my memories of mine.

And then there's my mother. We were very close. She was not just my mother, but my friend. Always, it seemed, giving, loving, and laughing. She was wonderful to me and my brothers and our children. She had many interests and even had a special "something" for Native Americans. She loved their art (definitely their jewelry) and sympathized with their history. I find it interesting that Verma Harrison is 100% Native American.

Well, I felt the need to share these things. Now, I want to focus on Ms. Harrison. Although we despise what has happened at the hands of Verma Harrison, we do not despise the person, Verma Harrison. I cannot remember if it was the first or second day when we learned the driver had been intoxicated with a blood alcohol level of 1.9, but I remember thinking, "My God, what happened to this woman that left her with no sense of self-worth, self-respect, self esteem? What happened in her life that caused her to think so irrationally and behave so irresponsibly? What has driven her?" I felt from the beginning that she probably had alot of problems and needed alot of help. I knew I was going to write to her to see if I could help. Knowing that God hears when we call upon Him in truth, I fasted and prayed for three days asking God to give me insight into Ms. Harrison, so that my letter would be effective.

Early in November of '96 I wrote to her to tell her that I didn't hate her, but wanted to help her. I explained to her my reasons for my perspective and my forgiveness; for

they are found in the Bible and are the fruits of a relationship with the Lord, Jesus Christ, and by faith in His word.

Ms. Harrison wrote back to me—to <u>all</u> of our family. She wrote a very long letter. A letter which confirmed my impressions of her while writing my first letter to her. Indeed, she suffered much abuse at the hands of irresponsible adults during her growing up years, including sexual and alcohol-influenced abuse. Now, I am a believer that we need to take responsibility for our actions. We need to make choices for good or for evil, for life or for death, in all our daily actions. There are many people, I think, who love to blame their parents, their siblings, their teachers, babysitters or the lack of enough candy in their Christmas stockings for their depressions and woes in life. I've been one of them. These folks need to get a grip—it's true—and start making lemonade with those lemons. However, they need to be loved and helped along the way to hopefully reach that point. And then they still need to be loved. And I believe love never fails.

Some have said we are foolish for taking this stand. Some say she's carefully scheming with her lawyer to pull our heartstrings for the very purpose of my writing these things to you. Yet I say 1) it was <u>I</u> who wrote to her first, 2) we've made contact twice with her pastor. She's been in attendance since the crash at a local church, and we've contacted the pastor to discuss her actions and faith, and 3) even if her story weren't true, I would still have the satisfaction of knowing that I did the right thing in case it were true.

In her letters, I've received and sent several now, she has expressed remorse for what she's done. I think it is not only remorse for the consequences of whatever might be coming to her, but remorse over the injury she has caused this family. We believe it is real. We believe she is waking up and trying to make steps towards a better way of living. As I stated previously, we've made contact with her pastor who confirmed what she had written to us and more. What we've learned is that she's been in counseling 2 x per week

at the minimum, she's been in an intensive discipleship/rehab program with a group called Overcomers Outreach, which is an offshoot of their church, and she has been ACTIVELY involved in reaching out to others who have addictions, telling them of her life, telling them what happened on June 28, 1996, telling them of love and forgiveness and healing and hope. We don't want any of this to end! She wrote and told me how she was about to graduate college with a degree in business, but wants to change that so she can counsel women. She believes she has something to give now. We want her to have the chance to give it away.

We've been warned that those awaiting sentencing are on their best behavior because they are very scared. And while we can believe that, we still have reason to believe that Ms. Harrison's rehabilitation is genuine, and that her desire to counsel other women who are suffering with the abuses she's received or inflicted upon herself, is real, too.

I've attended several MADD meetings. They did not seem to like my point of view, in fact some began to get argumentative. When I suggested that if she's telling the truth, she may be able to reach other alcoholics before they kill someone's loved one, the folks at the meeting saw that maybe some good could come out of it.

Justice Knapp, there's been an awful lot of pain and suffering: my husband and me and our children, my brothers and their families, my dear father, who's been a very broken, hurting man, and the many, many others in Janice's and Robyn's spheres of influence. If any good could come of this—we are all for it. We want to see Ms. Harrison have the chance to make good with her life and the lives of her children, and we want to see her reach out to help heal those hurting women she calls "my people."

I don't claim to know all she needs right now. She broke the laws of our land and I don't know what's in store for her because of this. We want you to know that we consider her an ally and not an enemy if she is going to pursue what is good and right. If she does this, she'll be fighting the true enemy with us—which is evil itself. And that battle is

won one heart at a time. Let her influence others so that perhaps even one other mother and father, daughter & son-in-law will not have to weep the bitter tears we've wept.

Thank you very much for letting us have our say and for considering our thoughts.

Respectfully,
/s/ Cindy Griffiths
/s/ Bill Griffiths

The trial court sentenced Harrison to 5 years' probation on each count, which sentences were to be served consecutively. The conditions of her probation included random alcohol and drug testing and counseling. In rendering sentence, the trial court stated:

> I am deeply touched by the letter from Mr. and Mrs. Griffiths, they express a forgiveness and a relationship with God that is difficult, I think, for most of us to understand. The more understandable emotions are those expressed by other members of the family, which are quite simply, punish her as stringently, as severely as possible. And if I did that, it might give them some temporary sense of relief or some sense that our loved ones lives had been vindicated to some small, small degree.
>
> . . . .
>
> . . . Were it not for the letter from Mr. and Mrs. Griffiths, I think I would have, beyond a doubt, sentenced you to prison, but in the face of their expressed forgiveness and their belief in you, Ms. Harrison, which I certainly hope is not in vain, I feel that probation is appropriate in this particular instance.

The State appealed, contending that the trial court abused its discretion by rendering excessively lenient sentences. *State v. Harrison*, 7 Neb. App. 350, 583 N.W.2d 62 (1998). The Court of Appeals stated that according to its "examination of all the factors," it was "of the opinion that a period of incarceration is required to meet the requirements of a proper sentence under the facts of this case." *Id.* at 359, 583 N.W.2d at 68. The Court of Appeals did not hold that the trial court had abused its discretion. Nonetheless, the Court of Appeals vacated Harrison's sentences of probation and remanded the cause for imposition

of two sentences of 20 months' to 5 years' incarceration, to be served consecutively. Harrison now appeals from that decision.

## ASSIGNMENTS OF ERROR

Harrison asserts that the Court of Appeals erred in failing to properly apply the standard of review, in finding that the sentences are excessively lenient, and in vacating the sentences and remanding the cause for imposition of two consecutive sentences of 20 months' to 5 years' incarceration.

## SCOPE OF REVIEW

When the State appeals from a sentence, contending that it is excessively lenient, an appellate court reviews the record for an abuse of discretion, and a grant of probation will not be disturbed unless there has been an abuse of discretion by the sentencing court. *State v. Detweiler*, 249 Neb. 485, 544 N.W.2d 83 (1996).

## ANALYSIS

In her petition for further review, Harrison argues that the Court of Appeals improperly applied the standard of review in evaluating her sentences, as it did not make any determination as to whether the trial court had abused its discretion in imposing sentences of probation.

In *State v. Jallen*, 218 Neb. 882, 359 N.W.2d 816 (1984), we held that the same scope of review applies in the lenient sentence context as applies in the excessive sentence context. See, also, *State v. Hoffman*, 246 Neb. 265, 517 N.W.2d 618 (1994) (indicating that such is constitutionally required). Thus, regardless of whether an appellate court is reviewing a sentence for its leniency or for its excessiveness, a sentence imposed by a district court that is within the statutorily prescribed limits will not be disturbed on appeal unless there appears an abuse of the trial court's discretion. *State v. Jallen, supra*. See *State v. Detweiler, supra*.

It is not the function of an appellate court to conduct a de novo review of the record to determine whether a sentence is appropriate. *State v. Ellen*, 243 Neb. 522, 500 N.W.2d 818 (1993). The sentencing court is not limited in its discretion to any mathematically applied set of factors. The appropriateness

of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *State v. Riley,* 242 Neb. 887, 497 N.W.2d 23 (1993).

In *State v. Philipps,* 242 Neb. 894, 496 N.W.2d 874 (1993), this court addressed the abuse of discretion standard in the excessive sentence context. In *Philipps,* the defendant had stolen approximately $10,000 from her employer and was found guilty on three misdemeanor counts. The defendant had attempted to make restitution by paying back the employer, was under financial pressure when the theft occurred, had no prior criminal record, was remorseful, and was 29 years old and pregnant at the time of sentencing. Nonetheless, the trial court sentenced the defendant to the maximum imprisonment, 1 year on each count, with the sentences to be served concurrently. The Court of Appeals concluded that the sentences were excessive and reduced the sentences to probation. This court reversed the Court of Appeals' judgment, holding that the sentences did not constitute an abuse of discretion, even though a mechanical application of the statutory factors would suggest that imprisonment was unnecessary. See *State v. Philipps,* 242 Neb. at 904, 496 N.W.2d at 881, Shanahan, J., dissenting (noting that "6 of the 11 factors in [Neb. Rev. Stat. § 29-2260 (Reissue 1995)] favoring probation over imprisonment" were present).

We have long held that a judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. See, e.g., *State v. Irons,* 254 Neb. 18, 574 N.W.2d 144 (1998). In *Pettegrew v. Pettegrew,* 128 Neb. 783, 788, 260 N.W. 287, 289 (1935), we stated: " 'If the reasons given by the court for its action are clearly untenable or unreasonable, if its action clearly amounts to a denial of justice, if clearly against justice or conscience, reason and evidence, it has abused its discretion.' " Quoting *State v. District Court,* 213 Iowa 822, 238 N.W. 290 (1931). Accordingly, when applying the criteria enumerated in § 29-2322, which authorizes an increase of sentence on appeal, the inquiry is whether the trial court's decision was clearly

untenable, unfairly deprived a litigant of a substantial right, and denied a just result. See *State v. Rittenhouse*, 1 Neb. App. 633, 510 N.W.2d 336 (1993). Thus, so long as the trial court's sentence is within the statutorily prescribed limits; is supported by competent evidence, see, *State v. Philipps, supra*; *State v. Foral*, 236 Neb. 597, 462 N.W.2d 626 (1990); and is not based on irrelevant considerations, see *State v. Pattno*, 254 Neb. 733, 579 N.W.2d 503 (1998) (holding trial court abused discretion by relying on personal religious views), an appellate court cannot say that a trial court has abused its discretion. Such a sentence is not untenable, does not unfairly deprive a litigant of a substantial right, and does not deny a just result.

The question, then, is whether the trial court in the instant case abused its discretion by sentencing Harrison to probation. In conducting this analysis, we are mindful that " '[t]he trial court has the opportunity to observe the defendant throughout the judicial process and is in a better position than this court to determine whether the defendant is suited for probation.' " *State v. Stastny*, 227 Neb. 748, 751, 419 N.W.2d 873, 875 (1988), quoting *State v. Dobbins*, 221 Neb. 778, 380 N.W.2d 640 (1986). Moreover, a sentencing judge has broad discretion as to the source and type of information, including personal observations, which may be used as assistance in determining the kind and extent of the punishment to be imposed. *State v. Pattno, supra.*

The Court of Appeals applied § 29-2322 in determining that Harrison's sentences were excessively lenient. Section 29-2322 states in relevant part:

[T]he appellate court, upon a review of the record, shall determine whether the sentence imposed is excessively lenient, having regard for:

(1) The nature and circumstances of the offense;

(2) The history and characteristics of the defendant;

(3) The need for the sentence imposed:

(a) To afford adequate deterrence to criminal conduct;

(b) To protect the public from further crimes of the defendant;

(c) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and

(d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and

(4) Any other matters appearing in the record which the appellate court deems pertinent.

However, the Court of Appeals did not consider the elements contained in § 29-2260. When determining whether to impose probation, the trial court must consider the factors set forth in § 29-2260. Thus, on appeal, an appellate court must likewise consider § 29-2260 in determining whether probation may be imposed, whether reviewing a sentence for excessiveness pursuant to Neb. Rev. Stat. § 29-2308 (Reissue 1995), see *State v. Philipps*, 242 Neb. 894, 496 N.W.2d 874 (1993), or for leniency under § 29-2322, see, *State v. Jallen*, 218 Neb. 882, 359 N.W.2d 816 (1984); *State v. Hoffman*, 246 Neb. 265, 517 N.W.2d 618 (1994). Section 29-2260 states in relevant part:

[T]he court may withhold sentence of imprisonment unless, having regard to the nature and circumstances of the crime and the history, character, and condition of the offender, the court finds that imprisonment of the offender is necessary for protection of the public because:

(a) The risk is substantial that during the period of probation the offender will engage in additional criminal conduct;

(b) The offender is in need of correctional treatment that can be provided most effectively by commitment to a correctional facility; or

(c) A lesser sentence will depreciate the seriousness of the offender's crime or promote disrespect for law.

(3) The following grounds, while not controlling the discretion of the court, shall be accorded weight in favor of withholding sentence of imprisonment:

(a) The crime neither caused nor threatened serious harm;

(b) The offender did not contemplate that his or her crime would cause or threaten serious harm;

(c) The offender acted under strong provocation;

(d) Substantial grounds were present tending to excuse or justify the crime, though failing to establish a defense;

(e) The victim of the crime induced or facilitated commission of the crime;

(f) The offender has compensated or will compensate the victim of his or her crime for the damage or injury the victim sustained;

(g) The offender has no history of prior delinquency or criminal activity and has led a law-abiding life for a substantial period of time before the commission of the crime;

(h) The crime was the result of circumstances unlikely to recur;

(i) The character and attitudes of the offender indicate that he or she is unlikely to commit another crime;

(j) The offender is likely to respond affirmatively to probationary treatment; and

(k) Imprisonment of the offender would entail excessive hardship to his or her dependents.

In the instant case, there was competent evidence received by the trial court during sentencing that supports the imposition of probation under § 29-2260. Harrison's testimony, the letters from her community, and the Griffiths' letter indicate that (1) Harrison is unlikely to commit another crime, (2) Harrison is likely to respond affirmatively to probationary treatment, and (3) imprisonment would entail excessive hardship to Harrison's children, all of which are factors that weigh in favor of probation. See § 29-2260(i), (j), and (k). The above facts likewise support the imposition of probation considering § 29-2322(3)(b) and (4).

The State argues that the Griffiths' letter is nothing more than a letter of forgiveness and, thus, that the trial court relied on irrelevant evidence in imposing Harrison's sentences of probation. Assuming without deciding that a victim's forgiveness is a relevant circumstance, we note that the Griffiths' letter expresses more than the Griffiths' forgiveness; it is evidence that "Harrison's rehabilitation is genuine." Thus, the letter is clearly relevant, and we cannot say that the trial court abused its discretion in considering such.

The State also notes that the Court of Appeals concluded that "[t]he protection of the public from further crimes by Harrison

cannot be assured under the conditions of probation . . . imposed . . . ." *State v. Harrison,* 7 Neb. App. 350, 359, 583 N.W.2d 62, 67 (1998). This conclusion was apparently based on Harrison's prior problems with alcohol and gave little credence to the evidence concerning Harrison's subsequent progress toward rehabilitation. However, as we have already stated, an appellate court may not review sentences de novo, but, rather, is bound by the abuse of discretion standard. In light of the competent evidence indicating that Harrison was making significant progress toward rehabilitation, we cannot say that the trial court's determination in this regard was an abuse of discretion.

Finally, the State notes that the Court of Appeals concluded that Harrison's sentences of probation did not reflect the seriousness of the offense, promote respect for the law, or provide just punishment, which factors constitute an element under § 29-2322(3)(c). Although the seriousness of the crime may weigh in favor of imprisoning Harrison, it does not, by itself, indicate that the trial court abused its discretion. Obviously, the offenses in the instant case were quite serious, and that fact should not be diminished. However, a sentence should fit the offender and not merely the crime. *Williams v. New York,* 337 U.S. 241, 69 S. Ct. 1079, 93 L. Ed. 1337 (1949). Indeed, this court has repeatedly recognized the importance of probation to our system of criminal justice, stating that " ' "[a] sentence not involving confinement is to be preferred to a sentence involving partial or total confinement in the absence of affirmative reasons to the contrary.". . .' " *State v. Javins,* 199 Neb. 38, 40-41, 255 N.W.2d 872, 874 (1977), quoting *State v. Shonkwiler,* 187 Neb. 747, 194 N.W.2d 172 (1972). Thus, "justice" may certainly be served by a sentence of probation. Whether justice is so served is a matter that is, in the first instance, properly left to the trial court.

Were our standard of review de novo, we may have agreed with the Court of Appeals and reached a different result than the trial court. Nonetheless, based on the foregoing analysis, we conclude that the trial court did not abuse its discretion in sentencing Harrison to probation and, thus, that Harrison's sentences are not excessively lenient. Therefore, we reverse, and

remand the cause with directions to reinstate the sentences of the district court.

REVERSED AND REMANDED WITH DIRECTIONS.

MILLER-LERMAN, J., not participating.

WRIGHT, J., dissents.