STATE OF NEBRASKA, APPELLANT, V.
MICHELLE L. CHARLES, APPELLEE.
691 N.W.2d 567

Filed February 1, 2005.    No. A-04-630.

■■■■■■■

Tricia A. Freeman, Chief Deputy Sarpy County Attorney, and Nissa Linman, Senior Certified Law Student, for appellant.

Patrick J. Boylan for appellee.

SIEVERS, MOORE, and CASSEL, Judges.

SIEVERS, Judge.

Michelle L. Charles pled guilty to the crime of intentional child abuse, a Class III felony. The district court for Sarpy County sentenced Charles to an 18-month term of probation. The State of Nebraska, through the Sarpy County Attorney, has appealed to this court on the ground that the sentence is excessively lenient.

## I. FACTUAL BACKGROUND

On November 10, 2003, Charles was charged with placing a minor child, Ethen F., in a situation that endangered his health or life, or cruelly punishing Ethen, or depriving Ethen of necessary care, resulting in serious bodily injury in violation of Neb. Rev. Stat. § 28-707(5) (Cum. Supp. 2004), a Class III felony. She was also charged with first degree assault upon Ethen in violation of Neb. Rev. Stat. § 28-308 (Reissue 1995). On March 24, 2004, before the Honorable George A. Thompson in the district court for Sarpy County and pursuant to a plea agreement, Charles pled guilty to intentional child abuse and the assault charge was dismissed. Because of its importance to our resolution of this case, we set forth the entire factual basis provided by the county attorney's office as follows:

> [Deputy county attorney]: Your Honor, on October 23rd of 2003, investigators with the Sarpy County Sheriff's Office were called to Children's Hospital in reference to suspicious injuries that had been obtained by an eight-month-old baby. They arrived at that location, had occasion to speak with the doctors, who indicated that [Ethen] had been life-flighted to [Children's] Hospital with life-threatening injuries as a result of what they considered to be applied

trauma. When the detective talked with the doctors, they indicated that [Ethen] had bleeding and swelling on the brain and retinal hemorrhaging. The doctors concluded after their assessment of [Ethen] that [he] had been a victim of shaken baby syndrome.

The investigator proceeded to conduct an investigation, had contact with . . . Charles, who is the caregiver for [Ethen]. At the time that they spoke with . . . Charles — they spoke with her actually a couple of different times. The first time she recounted a series of events that occurred in which she was playfully tossing [Ethen] in the air. As she tossed [Ethen] in the air, as [Ethen] was coming back down she wasn't able to get a good grab and [Ethen] fell, hitting a table and then hitting the floor.

After investigators had learned that [Ethen's] injuries were as a result of shaking, they went back and spoke with [Charles] yet again, and at that time she indicated that before she had playfully tossed [Ethen] in the air, that she, in fact, had shook [him]. When they talked with her about her reasons for shaking [Ethen], she indicated that she was in a mood, that [Ethen] was crying when he had been dropped off and that he was on her last nerve, that she was irritated with the mother for a series of events that occurred, and at that point she shook [Ethen]. When she was confronted with the issues, that the injuries to [Ethen] and their severity indicated a violent shaking, she said, yes, in fact, she probably had violently shook [him]. These events occurred . . . in Sarpy County, Nebraska.

THE COURT: Okay.

Is that what you told the officers in response to their questions?

[Defense counsel]: She takes issue with I think the part about saying something where she had an argument or disagreement with mom. But other than that, I think she doesn't dispute it.

THE COURT: The rest is pretty much what happened?

[Charles]: Yes.

THE COURT: The Court finds a factual basis to support the plea.

When Charles appeared for sentencing on May 7, 2004, before the same trial judge, the deputy county attorney stated: "[D]uring the course of caring for Ethen . . . in her child care she violently shook him, causing irreparable harm and damage to [him]." The court interrupted, and we quote the exchange as follows:

THE COURT: Is there proof of that?

[Deputy county attorney]: Yes, Your Honor, there is.

THE COURT: That she shook [Ethen]?

[Deputy county attorney]: Yes. She admitted that she shook [Ethen].

THE COURT: No, she said she was throwing [Ethen] up in the air.

[Deputy county attorney]: Her interview with police, Your Honor, indicated that, in fact, she did shake [Ethen], and that I think the doctors concluded, based upon their evaluation and treatment of [Ethen], that, in fact, [he] was suffering from shaken baby syndrome.

THE COURT: [Ethen] had head injuries consistent with being dropped and hitting a table. But be that as it may, you may continue.

After hearing brief comments from defense counsel, Ethen's parents, and Charles, the trial judge read from the presentence investigation report. While we do not quote the portion read by the trial judge into the record, that portion is a single paragraph from the arrest report dated October 27, 2003. The portion read by the trial judge recounts only the story that Charles had thrown Ethen up in the air and that he had hit his head on the ceiling, the coffee table, and the floor. The trial judge then stated as follows:

Part of what you [Charles] did was a coverup. You said [Ethen] was bouncing in a bouncy chair and something let loose and he went out, and you tried to cover up whatever you did. [The sheriff's office's incident report shows that Charles initially said that Ethen had fallen out of the bouncy chair but that he had been buckled in.]

The Court notes you have no previous record, you spent some time in jail [1 day], you're married with two children, presently living in Arizona.

Your statement: "I was found guilty of hurting a child. I'm sorry that it happened. It wasn't intentional. I am not a

violent person. I am sorry that this happened. It won't ever happen again. I am sorry. I can't express how sorry I am."

The Court finds you are a candidate for probation under certain terms and conditions. I have a copy for you and counsel, and you're directed to report to the probation office to go over these terms.

The trial court's order sentenced Charles to probation under the supervision of the "Chief Probation Officer of District Number Five of Sarpy County" on the following terms and conditions: (1) "obey all laws"; (2) "avoid disreputable places and social contact with persons having criminal records"; (3) "report to the probation officer as directed and provide [such] officer with a written report no later than the 10th day of each month"; (4) "answer any reasonable inquiries on the part of the probation officer concerning [her] conduct or condition, and . . . allow the probation officer to visit [her] home"; (5) "work at suitable employment, and make no employment changes without first consulting [her] probation officer"; (6) "remain within the State of Nebraska and notify her probation officer of any change in address"; (7) "not drink alcoholic beverages to excess"; (8) "be confined in the county jail for [1] day with credit for 1 day served"; (9) "serve a term of [29] days in the jail of Sarpy County, Nebraska, at the end of probation unless waived by the Court"; (10) "pay the costs of this action . . . in the amount of $105.00"; (11) "pay a Probation Administrative Enrollment Fee of $30.00 [and a] Probation Programming Fee of $25.00 per month for [18] months"; and (12) "this probation may be transferred to the State of Arizona."

Under Neb. Rev. Stat. § 29-2320 (Cum. Supp. 2004) and after requesting and securing the approval for this appeal from the Attorney General, the State has appealed the sentence as excessively lenient.

## II. ASSIGNMENT OF ERROR

The State alleges that the district court abused its discretion by imposing an excessively lenient sentence.

## III. STANDARD OF REVIEW

Whether an appellate court is reviewing a sentence for its leniency or its excessiveness, a sentence imposed by a district court that is within the statutorily prescribed limits will not be

disturbed on appeal unless there appears to be an abuse of the trial court's discretion. *State v. Fields,* 268 Neb. 850, 688 N.W.2d 878 (2004). It is not the function of an appellate court to conduct a de novo review of the record to determine whether a sentence is appropriate. *State v. Harrison,* 255 Neb. 990, 588 N.W.2d 556 (1999). The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

## IV. ANALYSIS

The State argues that the sentence imposed in this case was an abuse of discretion because the trial court operated from the premise that Ethen was not a victim of shaken baby syndrome, but, rather, had been tossed in the air and struck his head against the ceiling, a coffee table, and the floor when Charles failed to catch him. The record clearly shows that the trial court either mistakenly concluded that Ethen was not injured by shaking or simply ignored that fact.

■ That fact is an important consideration in this appeal because Neb. Rev. Stat. § 29-2260 (Reissue 1995) requires that when considering probation versus imprisonment, the trial court must have "regard [for] the nature and circumstances of the crime." Also, Neb. Rev. Stat. § 29-2322 (Reissue 1995) requires that in our determination of whether a sentence imposed is excessively lenient, we must have regard for "[t]he nature and circumstances of the offense," among other things.

■ There are two reasons why the trial court was clearly wrong in not regarding the nature and circumstances of the offense as a shaken baby case. The first reason is that the law has long been that a plea of guilty admits all facts alleged in the information and recited in open court by the State. *State v. Bargen,* 219 Neb. 416, 363 N.W.2d 393 (1985). See, *State v. Jones,* 214 Neb. 145, 332 N.W.2d 702 (1983); *State v. Johnson,* 7 Neb. App. 723, 585 N.W.2d 486 (1998). As is apparent from our recitation of the factual basis provided to the trial court, Ethen's injuries were a result of shaking and upon the investigators' return visit with Charles, she admitted she had in fact shaken Ethen for the reasons that "she was in a mood, that [Ethen] was crying[,] that she was irritated with the mother[,] and at that point she shook [Ethen]."

Moreover, when asked directly if Charles told the officers such things, her counsel only disputed that she had had "an argument or disagreement with mom," and Charles herself answered in the affirmative when the court asked, "The rest is pretty much what happened?"

The second reason we must find that the trial court misapprehended the nature and circumstances of the crime is that a thorough review of the Sarpy County sheriff's office's reports in the presentence investigation report leaves no doubt that Ethen was the victim of a violent shaking. The incident report dated November 4, 2003, indicates that three investigators, including Kathe Erhart and Chris Teuscher, and a representative of the Sarpy County Attorney's office had attended a meeting at Children's Hospital on October 30 to discuss Ethen's case. That incident report, written by Investigator Erhart, specifically states that an ophthalmologist, a radiologist, and a neurologist "believed that the injuries to [Ethen] were caused from 'shaken baby'. [The ophthalmologist] described the retinal hemorrhaging which is indicative of shaken baby syndrome."

Investigator Erhart's report continues to recount that a reinterview was done with Charles at approximately 3:40 p.m. on November 3, 2003. The report states that after telling Charles that the results of the medical tests had revealed shaken baby syndrome rather than injuries caused by her dropping Ethen, the investigators asked Charles if she shook Ethen at any time. Charles replied that she shook Ethen "back and forth while she held him in the air prior to tossing him toward the ceiling." Charles also "demonstrated to [the investigators] by raising her arms above her head and moving her arms back and forth in a shaking motion." Investigator Erhart's report further states:

> Inv[estigator] Teuscher asked if [Charles] was angry when she shook [Ethen]. [Charles] said she was in "a mood". Inv[estigator] Teuscher asked [Charles] what she was upset about. [Charles] said she had been upset lately about having no income, frustrated about being yelled at by [Ethen's] mom and that [Ethen's] mother has been getting on her nerves reference yelling at her about the car seat incident. Inv[estigator] Teuscher asked why that morning was different from any other morning and C[harles] stated

that [Ethen's mother] had been on her about the car seat and other issues for the past three days and that [Ethen] was crying when [his mother] had dropped him off.

We again asked [Charles] why she was angry and if she shook [Ethen] out of anger. [Charles] stated she doesn't remember a lot of things when she gets angry, that she guessed she was mad and that she "sees red sometimes."

Inv[estigator] Teuscher asked [Charles] what made her pick up [Ethen] and shake him. [Charles] admitted that [Ethen] had been crying and that she was on her "last nerve". We again talked about the shaking motion and [Charles] stated she did shake [Ethen]. [Charles] stated she took her frustrations out on the baby.

Neb. Rev. Stat. § 29-2261 (Supp. 2003) requires that unless it is impractical to do so, when an offender has been convicted of a felony, the court shall not impose sentence without first "ordering a presentence investigation of the offender and according due consideration to a written report of such investigation." While due consideration does not require acceptance of every factual assertion in a presentence report, here it is quite obvious that the trial court did not accord due consideration to the presentence investigation report, which clearly revealed a medical diagnosis of shaken baby syndrome as well as Charles' multiple admissions to investigators that she had shaken Ethen out of anger. The trial court wrongfully asserted at sentencing that "[Ethen] had head injuries consistent with being dropped and hitting a table." The presentence investigation report reveals that such statement was not true and that the doctors categorically rejected this initial story from Charles as the cause of Ethen's injuries.

Because the trial judge did not explain on the record his reasoning or rationale for the sentence imposed, we are forced to conclude that his misapprehension of the nature and circumstances of the crime had an effect on the sentence imposed. Moreover, it seems likely that such effect would be to lessen the sentence as the judge clearly saw the incident as an accident when Charles playfully tossed Ethen into the air and failed to catch him—the story she initially told investigators—after earlier stating that Ethen had fallen out of a "bouncy chair." The judge did not sentence Charles for a crime of which the nature and circumstances were severe

shaking of Ethen lasting from 30 to 60 seconds while Charles was angry, in "a mood," and on her "last nerve." The excessively lenient sentence appeal statute, § 29-2322, directs that we shall determine the question, having regard for the following:

(1) The nature and circumstances of the offense;

(2) The history and characteristics of the defendant;

(3) The need for the sentence imposed:

(a) To afford adequate deterrence to criminal conduct;

(b) To protect the public from further crimes of the defendant;

(c) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and

(d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and

(4) Any other matters appearing in the record which the appellate court deems pertinent.

### 1. NATURE AND CIRCUMSTANCES OF OFFENSE

We have already rather completely detailed the real nature and circumstances of the offense, which is that Ethen was severely shaken by an angry caregiver, Charles. The medical records and the presentence investigation report reveal that Ethen sustained a left subdural hematoma and cerebral edema and had "[v]ery significant retinal hemorrhag[ing] in the posterior poles of both eyes." By November 6, 2003, Ethen had sustained acute renal failure secondary to gentamicin toxicity, and as a result, he needed surgery for placement of a peritoneal dialysis catheter. While hospitalized, Ethen had several other surgical procedures for placement and maintenance of a central venous catheter for administration of medications.

Letters from both of Ethen's parents are part of the presentence investigation report. According to his mother, at slightly over 13 months of age, Ethen was unable to crawl, had limited use of his right arm, could not grasp objects with his right hand, and wore a brace. She reported that at that time, it was uncertain whether Ethen had full vision. Ethen's mother said that she no longer worked in order to stay home with Ethen, that she took him to therapy twice a week, and that a therapist from the schools came

to their home once a week for him. Ethen suffered from two or three seizures per day and was taking medication for the seizures, which medication made him sleepy and lethargic.

We note that the presentence investigation report reveals that while Ethen had been attending Charles' daycare for only 3 weeks, his mother had become concerned about a bruise on the back of his head, and that upon discussing the matter with Charles, Ethen's mother received what she deemed to be an unsatisfactory answer. Thus, Ethen's parents were considering changing daycare providers because they did not feel it was working out for Ethen at Charles' daycare.

As part of the presentence investigation, Charles was administered the "SAQ - Adult Probation III" profile, which assesses seven behavioral risks. Charles' results indicated she was in the "low risk range" on the antisocial scale, the aggressiveness scale, the stress coping scale, the alcohol scale, and the drug scale. With respect to truthfulness, the results indicated a "problem risk range" and the comments were that Charles "is defensive and guarded regarding self-disclosure. . . . A conscious or perhaps subconscious attempt to present self in an overly favorable light is evident. [Charles] is self-protective and minimizing [sic] self-report information." On the violence scale, the result was "medium risk range." The comments were as follows:

> Some violent tendencies are indicated, however, an established pattern of violence is not evident. Medium risk individuals are neither brutal nor passive. When provoked, or during periods of substance abuse, they can become abusive and combative. However, their lifestyles are usually free from violence. They are typically respectful of human rights. Yet, stress or substance abuse could exacerbate violent behavior.

Charles graduated from the 12th grade in May 1994 and has not had additional education, although she would like to become an x-ray technician. Charles reported to the probation officer that she was raised by her mother in Illinois but that she does not know who her biological father is. When Charles was 6 years of age, her mother married a man who, according to Charles, sexually abused her from the time she was 6 years of age until she was 14. She had some counseling in the eighth grade for the sexual

abuse, but she was uncertain how long that lasted. With respect to the present situation, Charles met twice with a family advocacy program counselor, who initiated contact with Charles. Charles indicated that each of the two sessions lasted approximately 30 minutes and that she was "unsure why she did not go to any more sessions," although she indicated that the counselor did not want Charles' children there and Charles had no one to watch them. Charles denies having an anger control problem and says that with respect to this offense, " 'I think I was stressed out not mad, just stressed out.' "

During the presentence investigation process, Charles wrote her answers to a number of questions, and we set forth all of the questions and her handwritten responses (which we italicize for clarity) as follows:

> A. If there was a victim of your offense (someone whose property was damaged, taken, or suffered injury) what do you think you should do to make up for that? *Apologize.*
>
> B. What do you think you should do for the community to make up for the expense and inconvenience of your arrest and prosecution? *Leave the state.*
>
> C. What do you think you should do for yourself to help you see that this or any other illegal activity does not happen again? *Seek counseling.*
>
> D. If the Court should see fit to place you on probation and you fail to complete the conditions imposed by the Court, what actions do you think the Court should take? *Explain reason for conditions of messing up.*

We do note that the presentence investigation report contains no indication of contact with Charles' husband, nor are there any letters or other indications of contact from any friend, family member, counselor, former employer, or other client of her daycare facility.

### 2. NEED FOR SENTENCE IMPOSED

#### (a) To Afford Adequate Deterrence to Criminal Conduct

We have earlier set forth the conditions of Charles' probation. Those conditions require no counseling, no community service, 1 day in jail which she has already served, and potentially 29 more

days in jail which may be waived. She is to obey the law—every citizen is under that obligation. She is not to drink—she says she does not drink at all anyway. She has to report to a probation officer, and she is allowed to do her probation in Arizona.

In short, this probationary sentence demands little and is essentially "painless." We cannot envision how a probationary sentence such as this, which requires virtually nothing of Charles, could act as any adequate deterrence for anyone about to commit the crime of *intentional* child abuse.

### (b) To Protect Public From Further
### Crimes of This Defendant

In this probationary sentence, there are no measures to protect the public, unless letting Charles go to Arizona could be considered as such. There is not even any prohibition against being a caregiver for children other than her own, which restriction seems like a rather natural consequence. Thus, she is free to operate another in-home daycare center. Accordingly, the sentence provides little protection from further crimes, although we certainly concede that Charles' lifestyle and past history do not suggest that she is bent on further criminal activity.

### (c) To Reflect Seriousness of Offense, to Promote
### Respect for Law, and to Provide
### Just Punishment for Offense

In our opinion, the sentence imposed fails to reflect the seriousness of the crime, to promote respect for the law, and to provide just punishment for the offense. The Sarpy County sheriff's office's reports reflect that when Investigator Teuscher asked Charles what made her pick up Ethen and shake him, she said that he had been crying, that she was on her last nerve, and that "she took her frustrations out on the baby." Investigator Erhart wrote in her incident report:

> I told [Charles] that the doctor's [sic] said that the shake had to be a violent shake and I asked [Charles] if she had violently shaken [Ethen] and she stated yes. . . .
>
> . . . .
>
> I asked [Charles] if she would harm her own children since she admitted to being under a lot of stress and she said no, that she would never hurt her own children. I asked

[Charles] if she shook [Ethen] because it was not her own child and she said yes, and that it had more to do with his mother.

As a result of this violent shaking, Ethen has endured a lengthy hospitalization and a number of surgical procedures; is not physically doing the things a baby his age should do, such as crawling and grasping objects with his right hand; and has limited use of his right arm. There is uncertainty as to whether Ethen has full vision. At the time of the presentence investigation, Ethen was experiencing several seizures a day and his medication had been increased, but his mother reported that the medicine made him sleep all night and most of the day and that he showed little interest in playing. Ethen's mother wrote:

> All I can say is that it breaks my heart. The other night I went to go check on [Ethen] before I went to bed and he was having a seizure. One of the things that is hard for me to accept is that we do not know the full extent of the damages that [Charles] has inflicted upon our son. All of Ethen's therapists and doctors tell me that time will tell.

The fact that the Legislature has prescribed a term of 1 to 20 years' imprisonment for this Class III felony is certainly an indication that this is a very serious crime. We cannot ignore the fact that this crime has multiple victims. Every parent's dream for his or her child is that he or she will be healthy, be free from disabling afflictions, be able to fully function in the world, and have the physical and intellectual capabilities to reach his or her greatest potential and to lead a happy and productive life. This crime has severely affected these natural hopes and dreams of Ethen's parents. While the future for Ethen cannot now be known for certain, there is evidence of significant physical impairment at the present time which obviously could be permanent. If his vision has been damaged and if he continues to have seizures, the damage to Ethen and by extension to his parents and other family members is all the more profound.

Ethen has endured physical pain, and his parents have endured emotional pain. Unfortunately, it is a fair inference from the record that Ethen and his parents will suffer more as time goes on. This probationary sentence does not in any way reflect the seriousness of the offense; promote respect for the law, which in

this instance is designed to protect the most helpless of victims; or provide just punishment for the offense.

### (d) To Provide Defendant With Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in Most Effective Manner

This probationary sentence has no educational or vocational training, medical care, or counseling components to it, and thus, it provides none of those things. On that basis, the probationary sentence cannot be justified.

### (e) Any Other Matters Appearing on Record Which Appellate Court Deems Pertinent

While Charles has said and written that she is sorry, we have previously set forth in this opinion Charles' own written answers to the probation officer's questionnaire because to us, they reveal something about Charles. To us, Charles' answers reveal a shallow understanding of the seriousness of the crime and the damage inflicted upon Ethen and his family, as well as very little in the way of real remorse and acceptance of responsibility for her actions.

The trial court's sentence allows Charles to put this entire tragedy "behind her" with little or no effort on her part and no punishment. We believe that Charles should have to directly confront the fact that she has been convicted of a major felony, intentional child abuse, and that she should think long and hard about why it happened and the potential lifelong consequences—physical, emotional, and financial—to Ethen and his family. In our view, a period of imprisonment is required so that Charles can actually deal with her crime and its consequences. In short, prison would require that she give up her "normal life," which the trial court's sentence hardly disturbed. Additionally, we suggest that the courts have a covenant with the citizenry that if you and your loved ones are injured by an intentional, violent act having severe consequences, we will ensure that justice is done—which sometimes requires punishment. And, such punishment should reflect society's unwillingness to tolerate the crime.

### 3. *STATE V. HARRISON*

In reaching our decision in this case, we have carefully considered *State v. Harrison*, 7 Neb. App. 350, 583 N.W.2d 62 (1998) (*Harrison I*), *reversed* 255 Neb. 990, 588 N.W.2d 556 (1999) (*Harrison II*). We believe it is important to spend some time recounting that case. In *Harrison I*, we sustained the State's contention that two consecutive sentences of 5 years' probation were excessively lenient for two motor vehicle homicide convictions in connection with an accident in which the defendant, after a night of drinking, drove her vehicle at 70 m.p.h. into the rear of a van (which had pulled completely onto the highway shoulder), resulting in the deaths of the van's two passengers, a grandmother and her granddaughter, and seriously injuring the driver, the grandfather. The defendant had previously been given an opportunity to rehabilitate herself in connection with a previous driving under the influence conviction from another state, but failed to complete the alcohol abuse course, and we found that the two probationary sentences would not serve as an adequate deterrent to further criminal conduct.

■ Our decision was reversed by the Nebraska Supreme Court, and the probationary sentences reinstated, in *Harrison II*, where the Supreme Court said:

> [W]hen applying the criteria enumerated in § 29-2322, which authorizes an increase of sentence on appeal, the inquiry is whether the trial court's decision was clearly untenable, unfairly deprived a litigant of a substantial right, and denied a just result. . . . Thus, so long as the trial court's sentence is within the statutorily prescribed limits[,] is supported by competent evidence . . . and is not based on irrelevant considerations . . . an appellate court cannot say that a trial court has abused its discretion. Such a sentence is not untenable, does not unfairly deprive a litigant of a substantial right, and does not deny a just result.

(Citations omitted.) 255 Neb. at 1001-02, 588 N.W.2d at 563.

In reversing our decision and reinstating the probationary sentences, the Supreme Court in *Harrison II* acknowledged that were the standard of review de novo, it may have agreed with this court and reached a different result than the trial court. However,

the Supreme Court could not conclude that the trial court abused its discretion in sentencing the defendant to probation. Recently explaining its decision in *Harrison II*, the Nebraska Supreme Court stated in *State v. Fields*, 268 Neb. 850, 855, 688 N.W.2d 878, 882 (2004):

> [W]e refused to find a sentence excessively lenient in a motor vehicle homicide case when the defendant expressed deep remorse for her conduct and promised to maintain sobriety, there were letters from the community attesting to the defendant's rehabilitation efforts, and the record contained letters from the victim's family expressing their opinion that the defendant's remorse and rehabilitation were genuine. In addition, the defendant was unlikely to commit another crime, she would respond favorably to probation, and imprisonment would place a hardship on her children.

When we examine the instant case in light of the above-quoted factors, we find that we cannot say Charles has expressed deep remorse, that there is nothing in the presentence investigation report detailing any rehabilitation efforts beyond two 30-minute sessions with a counselor who initiated the contact with Charles, and that there are no letters from the victim's family which are supportive in any way of Charles or suggest that she should be placed on probation. The only factor present here which was present in *Harrison II* is that incarceration will undoubtedly impose a hardship on Charles' two young children. And, secondarily, it is likely that she will complete this probation, since it requires virtually nothing of her. We take this opportunity to note that in the presentence investigation report, the probation department made no recommendation about the sentence.

In conclusion, we agree with the State's contention that the sentence is excessively lenient and that it was an abuse of the trial court's discretion.

## V. RESOLUTION

■ Under the applicable statute, Neb. Rev. Stat. § 29-2323 (Reissue 1995), upon a finding that the sentence imposed is excessively lenient, we are to set aside the sentence and remand the cause for imposition of a greater sentence, remand the cause for further sentencing proceedings, or impose a greater sentence.

321

In the present case, given the trial judge's misapprehension of the nature and circumstances of the crime, we decline to remand the matter to him for resentencing, nor do we impose that task on another district judge. Accordingly, we set aside Charles' sentence of probation and hereby sentence her to serve a term of 2 to 5 years' imprisonment, and she shall receive credit against said sentence for the 1 day of jail time she has served.

SENTENCE MODIFIED.