STATE OF NEBRASKA, APPELLEE, V.
LUCKY I. IROMUANYA, APPELLANT.
719 N.W.2d 263

Filed August 11, 2006. No. S-05-367.

Korey L. Reiman, of Reiman Law Firm, and John Stevens Berry, Sr., John S. Berry, and Jason M. Caskey, Senior Certified Law Student, of Berry & Kelley Law Firm, for appellant.

Jon Bruning, Attorney General, and James D. Smith for appellee.

HENDRY, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ., and HANNON, Judge, Retired.

STEPHAN, J.

During a party at a Lincoln, Nebraska, residence in the early morning hours of April 25, 2004, Lucky I. Iromuanya fired a single shot from a derringer handgun which wounded Nolan Jenkins and killed Jenna Cooper. Following a jury trial, he was convicted on one count of attempted second degree murder and a related count of use of a weapon to commit a felony in connection with the injury to Jenkins, and one count of second degree murder and a related count of use of a weapon to commit a felony relating to the death of Cooper. He was sentenced to 25 to 35 years' imprisonment on the attempted second degree murder conviction and 10 to 20 years' imprisonment on the related weapons conviction. He received a sentence of not less than life imprisonment nor more than life imprisonment on the second degree murder conviction and 10 to 20 years' imprisonment on the weapons conviction related to that charge. The four sentences were ordered to run consecutively. Iromuanya appeals from these convictions and sentences.

## I. FACTS

On the evening of April 24, 2004, University of Nebraska-Lincoln students Cooper and Lindsey Ingram hosted a barbeque and party at the Lincoln residence they shared. Both women were members of the university's varsity soccer team. The evening was planned because spring soccer season had just ended and final examinations were approaching. An initial group of 10 to 15 people gathered in the early evening hours. In addition to Cooper and Ingram, this group included several of their current teammates and a former teammate who was visiting Lincoln. Also present were Jenkins, who was dating Ingram, and Jenkins' cousin. Throughout the evening hours, most of those present consumed alcohol, and some played "drinking games." Witnesses testified that the party attendees were drinking and having a good time but that the party was not "wild."

After midnight, more people arrived at the party in several groups. One group included Carrington Hartley and Nathanial Buss, who both practiced against the women's soccer team and were acquainted with Cooper and other players. Another group included Margaret Rugh, who had been given directions to the party by someone who accompanied Hartley and Buss. Rugh had been acquainted with Iromuanya for several weeks. Shortly after her arrival, Rugh called Iromuanya and asked him to come to the party. Iromuanya and his friend Aroun Phaisan, who had both been at a downtown bar from approximately 11:45 p.m. until closing time, arrived at the party at approximately 1:30 a.m. in Phaisan's vehicle. Each had consumed one beer at the bar. When they arrived at the party, Phaisan parked his vehicle across the street from the house. Rugh greeted them outside the residence, took them inside, and introduced them to others who were present. Phaisan testified that during this time, people at the party were friendly to him and Iromuanya.

The events leading to the shooting began in the living room of the residence where a shot glass collection belonging to Cooper was displayed on open shelves. Several persons, including Phaisan and Iromuanya, had been standing in the general vicinity of the collection. Phaisan testified that he observed a Caucasian male handling some of the shot glasses. Buss testified that one of his friends showed him some shot glasses he had taken from the collection and asked for the keys to the vehicle which Buss had driven to the party. Buss gave him the keys. Buss knew that the collection belonged to either Ingram or Cooper, so he advised Ingram that "somebody," a male, had taken some shot glasses from the collection. Buss did not identify the individual by name but generally pointed him out to Ingram. Angered, Ingram confronted the individual. There is conflicting testimony as to whether this confrontation occurred in the house or in the driveway to the house. In any event, the individual admitted taking the shot glasses and placing them in a vehicle, and Ingram demanded that they go to the vehicle to retrieve them. In the meantime, Buss had gone to another room where Cooper was talking on a telephone and informed her of the incident. Upon hearing this, Cooper ended her telephone conversation and went outside. Buss followed shortly thereafter.

Inside the house, Phaisan had heard mention of the missing shot glasses and became concerned that he and Iromuanya might be accused of the theft because they had been standing in the area of the collection and were unknown to most of the persons at the party. He told Iromuanya that they should leave, and they exited the residence several minutes later. As Ingram was walking to the vehicle to retrieve the shot glasses, she observed Phaisan and Iromuanya leaving the house "very quickly." Knowing that they had been standing in the same area of the living room as the individual who had taken the glasses, and uncertain whether they had had any involvement in the incident, Ingram told them "very assertively" that no one could leave until everything was returned.

Adam Ellingson, who had been invited to the party by his friend Jenkins, had arrived at approximately 9 p.m. Later in the evening, he observed a group of people whom he did not know, including Phaisan and Iromuanya, standing in the general vicinity of the shot glass collection in the living room. He did not see anyone handle or take the shot glasses. At approximately 2 a.m., Ellingson went outside to check the windows of his vehicle, which was parked on the street in front of the house. Standing in the front yard, he observed a male whom he did not know come out of the house, followed closely by Ingram. Ellingson heard Ingram say that she wanted the shot glasses returned. During this conversation, Ellingson observed another male approaching the person to whom Ingram was talking and also observed Iromuanya and Phaisan come out of the house. He heard Ingram say that no one could leave until the shot glasses were returned. At that point, Ellingson went to the front door and called to Jenkins to come outside. He then returned to the front yard.

When Jenkins came out of the house, he grabbed Iromuanya's sweatshirt with both hands, pushing him backward, and asked if he had stolen items from the house. Iromuanya tried to push Jenkins away, stating that he had done nothing, and the two scuffled for approximately 5 seconds. Ellingson stepped in and placed Iromuanya in a bear hug to keep him from Jenkins, and Phaisan ultimately separated Iromuanya from Ellingson. Hartley also helped by pushing Jenkins backward. As they were being separated, Iromuanya punched Jenkins in the back of the head.

Ellingson testified that Iromuanya denied taking anything or doing anything wrong and said Ellingson could search him. Ellingson replied that he did not wish to search Iromuanya, but asked him not to leave until the shot glasses had been retrieved. Buss, who was also present during this confrontation, told Jenkins that Iromuanya had not taken the shot glasses.

After the scuffle, Brooke Bredenberg, one of the party guests, told Jenkins that Iromuanya was not the person who had taken the shot glasses. Seeing that Iromuanya "appeared to be very, very angry and appeared . . . like he still wanted to fight," Ingram approached him and told him several times to "calm down" and "chill out." Ingram testified that Iromuanya appeared not to pay attention to her and was focused on Jenkins, who was behind her. Iromuanya did not become calm. At that point, Ingram and Jenkins went to retrieve the shot glasses from the vehicle.

Buss, Hartley, Ellingson, and Cooper remained with Iromuanya. Phaisan was also in the area. Iromuanya was very upset, jumping around and repeating phrases such as "you don't know me" and "[d]on't mess with me." Iromuanya repeatedly asked who had run up on him. Observing that Iromuanya "was obviously pretty perturbed, pretty upset," Hartley approached him in an effort to calm him. Hartley testified that Iromuanya did not appear to be afraid, but, rather, was "riled up. I mean I would parallel his behavior to a fighting cock. He was all riled up, he was ready to go basically." Hartley believed that because he and Iromuanya were members of the same racial minority group and because Hartley knew the people at the party and Iromuanya did not, Hartley could provide Iromuanya with assurance that "nobody would be messing with him, that he would be fine and he would calm down." Hartley tried to talk to Iromuanya, but Iromuanya was still focused on Jenkins and was still yelling. Iromuanya tried to get around Hartley, so Hartley grabbed his arm. Iromuanya gave Hartley a "cold stare," and Hartley released his grasp. Iromuanya kept moving back and forth and Hartley had to move correspondingly in order to keep himself between Iromuanya and the direction of Jenkins.

At that point, Cooper stepped in and attempted to speak to Iromuanya in order to calm him, but he continued yelling in

the direction that Jenkins had gone. Buss had informed Cooper that Iromuanya had not taken the shot glasses. Iromuanya eventually acknowledged Cooper and seemed to become calmer, but then Cooper mentioned the shot glasses and he again became upset, stating that he had not taken them. Buss attempted to calm him down, telling him that everyone knew that he had not taken the shot glasses, but Iromuanya remained agitated. Buss then attempted to move Cooper away from Iromuanya. By that time, approximately 5 minutes had elapsed since the initial confrontation between Iromuanya and Jenkins.

Jenkins then walked back across the yard toward Iromuanya. He was walking at a normal pace, and some witnesses testified that his hand was outstretched, as if he intended to shake hands with Iromuanya. Jenkins testified that this was his intent. Bredenberg observed that Iromuanya appeared to become more upset as Jenkins approached, and she yelled to Iromuanya to "chill out, he's trying to apologize." Phaisan, who was nearby, heard this and thought there was no longer any reason for concern. Both Phaisan and Bredenberg thought Jenkins appeared calm as he approached Iromuanya. Hartley, who was also near Iromuanya, saw Jenkins coming and was initially worried that Iromuanya might think Jenkins was coming to hit him. But then Hartley heard Bredenberg shout out that Jenkins was coming to apologize and assumed that Iromuanya heard it too.

Jenkins approached within one step of Iromuanya, but not as aggressively as in the previous confrontation. Iromuanya then shoved Jenkins in the chest with both hands, knocking Jenkins backward. Hartley quickly stepped in between them and put his hands on Iromuanya's ribcage, and Phaisan reached his arm out in front of Jenkins to restrain him. Phaisan's back was to Iromuanya. Ellingson observed Iromuanya remove a handgun from the pocket of his trousers, "point it right at" Jenkins, who was approximately 5 feet away, and fire. Hartley, who was facing Iromuanya with his back to Jenkins, heard an explosion and then observed the handgun in Iromuanya's hand. Hartley grabbed Iromuanya's hand and pointed it toward the street. Hartley testified that at this point, Iromuanya yelled, "[Y]eah, what's up now? I'm the ghetto." Iromuanya and Phaisan then

ran to Phaisan's vehicle and drove away. Ellingson gave conflicting testimony regarding Hartley's position with respect to Iromuanya when the shot was fired.

After the shooting, Jenkins grabbed his head and walked toward the house. Buss testified that when he and Cooper had walked away from Iromuanya, he heard the shot and realized that Cooper had also been hit. He called out for emergency assistance. It was later determined that a single bullet entered Jenkins' left temple and exited above his left ear. The bullet then pierced Cooper's neck, causing her death.

When they were several blocks away from the scene of the shooting, Phaisan asked Iromuanya what had happened and he replied that he thought he had hit someone. At about that same time, Phaisan's cellular telephone rang and he recognized the caller as Rugh. Phaisan gave the telephone to Iromuanya and heard him say, "Charles Allen" and "you don't know me." Rugh had been in the house at the time of the shooting, but when she became aware of it, she suspected that Iromuanya was involved because she knew that he had carried a handgun in the past. Rugh testified that during their telephone conversation after the shooting, Iromuanya told her to say that his name was "Charles Allen" and that she did not know him. She testified that she told Iromuanya that he had shot a girl and that he said, " 'A girl?' " She stated at trial that she was not sure whether he was surprised that a girl was shot or that someone was shot. Four days after the shooting, however, Rugh told an investigator that when she told Iromuanya that he shot a girl, his response was " 'not a guy?' "

Phaisan drove to his apartment and told Iromuanya to go home. Phaisan then went in and told his girl friend that Iromuanya had shot at someone and missed and hit some girl. Although at trial Phaisan stated that he did not know Iromuanya's intent at the time of the shooting, he admitted that immediately after the incident, it "made sense to [him]" Iromuanya had shot at someone, and that he thought Iromuanya had shot at Jenkins.

After initially identifying Iromuanya as "Charles Allen," Rugh informed police of his identity. Police were then dispatched to the Lincoln address where Iromuanya resided. Iromuanya was observed leaving the house, and after being engaged in conversation, he told officers he had been home all night. Iromuanya

was patted down, and the weapon was found inside his right front jeans pocket. Chain of custody testimony at trial established that the handgun was in the same condition from the time of seizure until ballistics testing was conducted by Mark S. Bohaty, a criminalist employed by the Nebraska State Patrol crime laboratory. Bohaty identified the weapon as a single action .32-caliber derringer with two barrels in an "over and under" configuration. Bohaty testified that the weapon could only be fired by the separate steps of first cocking the hammer all the way back and then pulling the trigger. Test firing revealed a trigger pull of 9.5 pounds, which Bohaty described as "quite heavy" compared to other handguns. The shot which struck Jenkins and killed Cooper was fired out of the bottom barrel of the gun. There was an unfired round in the top barrel on which the primer was dimpled, indicating a misfire, although Bohaty could not say that this occurred on the day of the shooting. Test firing established that the derringer was relatively accurate.

Iromuanya did not testify or present any evidence in his behalf. The State offered videotaped and handwritten statements given by Iromuanya to Lincoln police following his arrest on the day of the shooting. The statements were received without objection. In the videotaped statement which was played for the jury, Iromuanya described the initial confrontation with Jenkins and Iromuanya's anger at being accused of stealing the shot glasses. He admitted that he intentionally fired the shot, but stated that he did not intend to kill either Jenkins or Cooper and that he was attempting to shoot "to the side" in order to scare Jenkins away from him. In his handwritten statement, Iromuanya acknowledged that a girl told him that she knew he did not steal anything and that when "the guy," presumably Jenkins, approached him the second time, the girl said, "don't worry he just wants to apologize." He further wrote that when the approaching male remarked that Iromuanya had punched him, Iromuanya pushed him back and drew the weapon. When the male continued to approach, Iromuanya stated, "I shot by him hoping to scare him and his friends."

In his closing argument, defense counsel characterized the issue to be decided by the jury as "murder or manslaughter." He argued that the evidence did not establish that Iromuanya acted

with the requisite intent to constitute second degree murder and attempted second degree murder, and he urged the jury to return a guilty verdict on a single count of manslaughter. The jury found Iromuanya guilty of all four charged offenses, and he was subsequently sentenced.

Additional facts will be set forth in our discussion of specific assignments of error.

## II. ASSIGNMENTS OF ERROR

Iromuanya assigns, consolidated, restated, and renumbered, that the trial court erred in (1) receiving testimony suggesting that Iromuanya was involved with a gang; (2) permitting Cooper's mother to testify and receiving certain portions of her testimony over his relevance objections; (3) not taking steps to shield jurors from "memorial buttons" worn by members of Cooper's family; (4) giving jury instruction No. 8, pertaining to the element of intent; (5) refusing to give three jury instructions requested by the defense; (6) failing to set aside the convictions based on insufficiency of the evidence; (7) ordering consecutive sentences on the two convictions for use of a weapon to commit a felony; and (8) imposing excessive sentences.

## III. ANALYSIS

### 1. CLAIMED SUGGESTION OF STREET GANG INVOLVEMENT

#### (a) Additional Facts

Phaisan testified that after the initial altercation, he saw Iromuanya being "pushed back" away from Jenkins by another person. When asked if the other person was Hartley, Phaisan responded that he thought so, but that the person had a different hairstyle on the night of the shooting than at the trial. The State then asked Phaisan whether Iromuanya had a different hairstyle that evening, to which Phaisan responded, "I think his hairstyle — I think it was braided . . . ." At that point, Iromuanya objected on the basis of relevance, raising concerns that the prosecution was trying to insinuate that he was in a gang, and the objection was sustained. Iromuanya did not move to strike, make a motion for a mistrial, or ask that the jury be instructed in any manner with respect to the remark.

During Rugh's testimony, she was asked who, other than Phaisan, Iromuanya normally hung out with. The trial court overruled Iromuanya's relevancy objection, and Rugh testified that Iromuanya told her that "he hung — I don't know if he hung out with his — like went and played basketball with his boys. . . . He went and played basketball with his boys, his friends."

Rugh testified that after the shooting, she lied to police and told them Iromuanya's name was "Charles Allen" because Iromuanya told her to and she was scared. During her testimony, she stated that she did not go back to her dormitory room the night of the shooting because she was "scared." When pressed by the State to explain what she was afraid of, she said she was afraid that somebody, "maybe some of [Iromuanya's] friends," would do something to her. Iromuanya objected to this testimony, arguing it was irrelevant and more prejudicial than probative. The objections were overruled.

(b) Standard of Review

■ In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. *State v. Grosshans*, 270 Neb. 660, 707 N.W.2d 405 (2005); *State v. Sanders*, 269 Neb. 895, 697 N.W.2d 657 (2005).

■ The exercise of judicial discretion is implicit in determinations of relevancy under Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1995), and prejudice under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1995), and a trial court's decision regarding them will not be reversed absent an abuse of discretion. *State v. Davlin, ante* p. 139, 719 N.W.2d 243 (2006); *State v. Sanders, supra*; *State v. Mowell*, 267 Neb. 83, 672 N.W.2d 389 (2003).

(c) Resolution

■ The testimony about Iromuanya's hairstyle on the day of the shooting was clearly irrelevant, as there was no issue in

this case as to his identity. The district court properly sustained the relevance objection. Because Iromuanya did not request additional action from the court, he cannot now complain of error in that regard. When an issue is raised for the first time in an appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition. *State v. McPherson,* 266 Neb. 715, 668 N.W.2d 488 (2003); *State v. Reed,* 266 Neb. 641, 668 N.W.2d 245 (2003). Moreover, it is unclear how the mere fact that a person wears his hair in braids implicates gang involvement. The record includes nothing to correlate braided hair with street gangs; indeed, it includes no specific reference to street gangs whatsoever. Thus, Phaisan's answer standing alone could not have resulted in prejudice to Iromuanya.

Rugh's testimony concerning her knowledge of who Iromuanya "hung out with" was relevant to the issue of how well she knew him, which would affect the credibility of her testimony at trial and her statements made the night of the shooting. In addition, her brief reference to "his boys," standing alone, was not prejudicial to Iromuanya. Rugh quickly explained that by "boys" she meant "friends." There is nothing in the record to correlate the phrase "his boys" with street gangs. During the cross-examination of Ellingson in which defense counsel sought to establish his friendship with Jenkins, counsel asked, "Nolan's one of your boys, right?" The only inference with respect to the phrase which can be drawn from this record is that it is used by young people in reference to male friends.

■ The testimony that Rugh was afraid of Iromuanya's friends was relevant to the issue of her credibility, which was challenged during trial. Rugh's trial testimony differed from the statements she had previously given to police regarding the shooting. In her prior statements, she stated that when she told Iromuanya that he had shot a girl, he replied, " 'not a guy?' " At trial, however, she testified that Iromuanya was surprised that someone was shot, not that a girl was shot. The fact that she was afraid after speaking to Iromuanya after the shooting is relevant to the jury's evaluation of which of Rugh's versions of events to believe. In addition, her testimony supports an inference that Iromuanya attempted to intimidate her into giving false information to the police soon after

the shooting had occurred. In this respect, we have held that a defendant's attempted intimidation of a witness is evidence of the defendant's conscious guilt that a crime has been committed and is a circumstance from which an inference may be drawn that the defendant is guilty of the crime charged. See *State v. Clancy*, 224 Neb. 492, 398 N.W.2d 710 (1987), *disapproved on other grounds, State v. Culver*, 233 Neb. 228, 444 N.W.2d 662 (1989). See, also, *State v. Freeman*, 267 Neb. 737, 677 N.W.2d 164 (2004). The trial court did not abuse its discretion in receiving this testimony.

Alternatively, Iromuanya argues that the combined effect of the admission of the testimony regarding his hairstyle, his "boys," and Rugh's fear of his friends amounted to prejudicial error because it suggested that he had gang ties. In support of this argument, he cites *Thomas v. State*, 625 So. 2d 1149 (Ala. Crim. App. 1992), and *People v. Parrott*, 40 Ill. App. 3d 328, 352 N.E.2d 299 (1976). *Thomas* was reversed by the Supreme Court of Alabama in *Ex parte Thomas*, 625 So. 2d 1156 (Ala. 1993). In reversing the case, however, the Alabama Supreme Court agreed with the premise that purposefully elicited testimony directly indicating gang membership was highly prejudicial to a defendant. *Ex parte Thomas, supra.* In that case, the state directly asked a witness about the defendant's gang ties in a case involving a driveby shooting after the defendant had specifically raised the impropriety of such questions. The Alabama Supreme Court found this was prejudicial error. *Id*. Similarly, in *Parrott*, the court held that in an action charging illegal sale of guns, it was irrelevant and highly prejudicial to allow evidence that the sale was made to street gangs. The instant case differs significantly from both *Thomas* and *Parrot* because, as noted above, the record includes no explicit reference to street gangs. We conclude that the evidence, even considered cumulatively, does not support Iromuanya's assignments of error.

2. TESTIMONY OF MARY ELLEN COOPER

(a) Additional Facts

The State's first witness was Dr. Reginald Burton, a trauma surgeon who treated Cooper for the gunshot wound. Asked to identify a person shown receiving medical treatment in a photograph, Burton testified: "That appears to be [Cooper]." The

photograph was received into evidence without objection. With respect to a similar photograph, Burton testified, "that would be [Cooper] again." That photograph was also received into evidence without objection.

Mary Ellen Cooper (Ellen) of Louisville, Kentucky, is Cooper's mother. Prior to trial, Iromuanya filed a "Motion to Exclude Witness" in which he asked the court to determine the propriety of permitting Ellen to testify at trial. The motion was argued at a pretrial hearing and was denied. On the first day of trial, the State called Ellen as its third witness. Before Ellen testified, defense counsel stated that he was renewing the objection made in the pretrial motion "to preserve my [rule] 403 objection." The trial court made no specific ruling at that time, but permitted the State to call Ellen as a witness.

Ellen testified without objection that Cooper was born on September 28, 1982, and that she also has a son who was 2 years older than Cooper. Over a relevance and rule 403 objection, Ellen testified that Cooper's interests included various sports, that she was involved in many school activities, and that she was "just an incredibly, incredibly well-rounded person." Also over a defense objection, Ellen testified as to Cooper's reasons for coming to the University of Nebraska-Lincoln to play soccer and the course of study which Cooper was pursuing at the university. In overruling the objection to this testimony, the court noted that it was relevant to show "how [Cooper got] here and that this was a soccer party and the people that are at the party and why they're there."

Without objection, Ellen explained Cooper's hobby of collecting shot glasses. She also testified that she left Lincoln on the morning of April 24, 2004, after staying with Cooper and Ingram for approximately 10 days. She testified that she had a telephone conversation with Cooper that evening, but the court sustained a hearsay objection regarding its substance.

Ellen testified that she returned to Lincoln on the afternoon of April 25, 2004, after learning of the shooting, and that she was taken to the hospital to see Cooper. At this point, Iromuanya's counsel objected and a sidebar conference was held, during which the prosecutor advised the court that he intended to have Ellen identify one of the photographs which was received during

Burton's testimony. The court indicated that it would allow the testimony for that purpose. When shown the photograph, Ellen responded, "That's my baby girl Jenna." In a sidebar conference immediately thereafter, defense counsel made the following statement:

> I'd like the record to reflect that, that was fairly dramatic there at the end and [Ellen] broke down into tears as [counsel] showed her a picture that's been received into evidence. So, for the record, I'm objecting to when [Ellen] started breaking down and crying. And I think this is also going to relate to my [rule] 403 motion, as she goes back there and sits in the courtroom. So that's all I have to say. Thank you.

Neither the prosecutor nor the trial court responded to this statement. There was no motion for a mistrial nor any further direct or cross-examination, and Ellen was excused and released from the sequestration order.

In denying Iromuanya's motion for new trial, the trial court further explained its rulings with respect to the testimony of Ellen as follows:

> A review of the record reflects that most of the testimony of Ellen Cooper was received without objection. Many of the objections made during her testimony were sustained. This court attempted to limit her testimony to areas relevant to the issues in the trial. The court notes that Ellen Cooper was one of the first witnesses called during the trial. She testified that Jenna Cooper had been collecting shot glasses for some time, similar to her aunt's Kentucky Derby glass collection. The evidence at trial revealed that shot glasses had been stolen from Jenna Cooper's house. There was a strong reaction from Jenna Cooper and her roommate Lindsay Ingram when it was discovered that the shot glasses had been stolen. This testimony put perspective on the reaction of the victims as these weren't just glasses that had been stolen, they were glasses that were part of a collection that had strong sentimental value to Jenna Cooper. The testimony about Jenna Cooper being a soccer player and an engineering major simply put in perspective the reason for the party at her house and explained who was there and why. It was the end of the Spring season and just before finals. The court notes that

there was no objection to the testimony about the shot glass collection. There was no objection to Ellen Cooper testifying that she had been to Lincoln to watch Jenna Cooper play soccer and had left on April 24 to return to Louisville. There were no objections to numerous other questions asked of Ellen Cooper concerning returning to Lincoln after she had been informed that Jenna Cooper had been shot. [Iromuanya] did object to Ellen Cooper identifying her daughter in a photograph. The court notes that this photograph had already been received into evidence during the testimony of the treating physician. There was no testimony that the treating physician knew Jenna Cooper prior to her being brought to the hospital. . . . The court notes that this was a photograph of Jenna Cooper at the hospital which had already been received into evidence, and was not a family photograph or a "Senior" picture. The State bears the burden of proving beyond a reasonable doubt each and every element of the crime charged, including proving the identity of the victim. (It is customary to have someone who knows the victim to identify the body.) As noted, Ellen Cooper was one of the first witnesses to be called after the doctor testified. If no one who knew Jenna Cooper identified the photograph, could an argument be made that the State had failed to identify the victim since the doctor did not know whether the person he treated was Jenna Cooper or some other gunshot victim? Arguably, circumstantial evidence could have been introduced to prove identity or some other witness could have later identified Jenna Cooper. If it was unnecessary to allow Ellen Cooper to identify her daughter as the person in the photograph, it is the conclusion of the court that this was not so prejudicial as to have denied [Iromuanya] his right to a fair trial, and does not require this court to grant him a new trial. The court notes that on numerous occasions the court reminded the jur[ors] that they must not let emotion, sympathy, or prejudice play a role in their deliberations.

### (b) Standard of Review

The exercise of judicial discretion is implicit in determinations of relevancy under rule 401 and prejudice under rule 403,

and a trial court's decision regarding them will not be reversed absent an abuse of discretion. *State v. Sanders*, 269 Neb. 895, 697 N.W.2d 657 (2005); *State v. Mowell*, 267 Neb. 83, 672 N.W.2d 389 (2003).

### (c) Resolution

The district court did not err in overruling the defense motion to preclude Ellen's testimony in its entirety. Our rules of evidence provide: "Every person is competent to be a witness except as otherwise provided in these rules." Neb. Evid. R. 601, Neb. Rev. Stat. § 27-601 (Reissue 1995). The issue on appeal, therefore, is whether the district court erred in overruling defense objections and permitting Ellen to testify on specific substantive issues as to which error has been assigned.

### (i) Identification

In a homicide prosecution, photographs of a victim may be received into evidence for the purpose of identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish malice or intent. *State v. Faust*, 265 Neb. 845, 660 N.W.2d 844 (2003); *State v. Decker*, 261 Neb. 382, 622 N.W.2d 903 (2001); *State v. Clark*, 255 Neb. 1006, 588 N.W.2d 184 (1999). Here, there was no objection to admission of the photographs depicting Cooper or the identification by the physician who treated her. The issue is whether the district court erred in permitting additional identification by a family member.

Iromuanya urges that we adopt a rule similar to that followed by Florida courts which precludes a family member of the deceased from identifying a homicide victim unless there are independent reasons to call the family member. See *Welty v. State*, 402 So. 2d 1159 (Fla. 1981). The basis for this rule, as articulated by the Supreme Court of Florida, is to "assure the defendant as dispassionate a trial as possible and to prevent interjection of matters not germane to the issue of guilt." *Id.* at 1162. Iromuanya contends that application of this rule to the instant case would have and should have prevented Ellen from giving the emotional identification of Cooper.

We have not previously addressed the specific issue of whether a family member should be precluded from identifying the victim of a homicide case. Numerous jurisdictions other than Florida

have no per se rule against family member identification of murder victims. See, *People v. Combs*, 34 Cal. 4th 821, 101 P.3d 1007, 22 Cal. Rptr. 3d 61 (2004); *Grayson v. State*, 824 So. 2d 804 (Ala. Crim. App. 1999); *People v. Harris*, 177 Misc. 2d 903, 679 N.Y.S.2d 242 (1998); *Matchett v. State*, 941 S.W.2d 922 (Tex. Crim. App. 1996); *State v. Moseley*, 336 N.C. 710, 445 S.E.2d 906 (1994); *State v. Buzzard*, 110 Idaho 800, 718 P.2d 1238 (Idaho App. 1986). These jurisdictions instead generally apply principles of rules 401 and 403 in determining the admissibility of the testimony on a case-by-case basis. See *id.* In doing so, they note that family member identification testimony is relevant because it is the State's burden to prove the identity of the victim and that such burden need not be met simply by a stipulation between the parties. See *id.* We note that even under the Florida rule, identification of a homicide victim by a family member can be considered harmless error in certain circumstances, as was the case in *Welty v. State, supra.*

We decline to adopt a bright-line rule on this issue, and instead, we align with those jurisdictions which utilize rules 401 and 403 to determine whether identification of a homicide victim by a family member is permissible under specific circumstances. The fact that Ellen became emotional when she made the identification must be considered in this analysis. However, Ellen's testimony was brief and occurred on the first day of a 9-day trial in which she was the third of 29 witnesses. Jurors were instructed at the beginning of jury selection and again upon final submission of the case that they should not permit sympathy or prejudice to influence their verdict. As noted, our review of this issue is for abuse of discretion. Based upon our review of the record and the reasoning given by the district court for receiving the identification testimony, we cannot conclude that it abused its discretion in doing so.

### (ii) Cooper's Background and Accomplishments

Iromuanya argues that Ellen's testimony regarding Cooper's background and accomplishments was irrelevant and "did nothing but create bias and prejudice and had no relationship to . . . guilt or innocence." Brief for appellant at 35. His argument is premised upon the principle that a defendant " 'has the right to

expect that his fate will be fixed with reference only to the circumstances of the crime with which he is charged.' " *People v. Hope*, 116 Ill. 2d 265, 278, 508 N.E.2d 202, 208, 108 Ill. Dec. 41, 47 (1986), quoting *People v. Gregory*, 22 Ill. 2d 601, 177 N.E.2d 120 (1961).

■ Evidence is relevant when it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *State v. Duncan*, 265 Neb. 406, 657 N.W.2d 620 (2003). Portions of Ellen's testimony about Cooper were clearly relevant to the circumstances of the crimes with which Iromuanya was charged. The fact that Cooper came to the University of Nebraska-Lincoln to play soccer was relevant to the circumstances under which she and Iromuanya came to be in the same place at the same time and was established by the testimony of many witnesses in addition to Ellen. The testimony that Cooper's hobby was collecting shot glasses, to which no objection was made, was relevant to the circumstances which led directly to the fatal shooting.

However, Ellen's testimony regarding Cooper's other hobbies and interests and Cooper's aspirations as a soccer player does not fall within the legal definition of relevancy in this criminal prosecution. Neither does Ellen's testimony that Cooper was a good student and a well-rounded person, as none of this evidence makes it more or less probable that Iromuanya committed the crimes with which he was charged. Accordingly, the trial court erred in receiving this evidence.

■ In a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt. *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006); *State v. Neal*, 265 Neb. 693, 658 N.W.2d 694 (2003). Harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant. *State v. Robinson, supra*; *State v. Freeman*, 267 Neb. 737, 677 N.W.2d 164 (2004). Harmless error review looks to the basis on which the jury actually rested its verdict; the inquiry is not whether in a trial that occurred without the error

a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *State v. Freeman, supra.*

We conclude that the error was harmless. The record reflects undisputed evidence that Iromuanya fired the shot which wounded Jenkins and killed Cooper. The critical issue at trial was whether he did so with an intent to kill Jenkins so as to constitute attempted second degree murder and second degree murder under the doctrine of transferred intent. On this point, there was testimony from several eyewitnesses regarding the circumstances of the shooting, including detailed accounts of Iromuanya's words and actions before and after the shot was fired. The jury also saw and heard Iromuanya's account of the events in the statements he gave to police. The jury was instructed that it was to determine intent from Iromuanya's "words and acts and all of the surrounding circumstances." While legally irrelevant, Ellen's brief testimony regarding Cooper's background had no prejudicial bearing on the issue of intent.

In addition, witnesses other than Ellen testified without objection that Cooper was an accomplished student-athlete who enjoyed a good relationship with her teammates. It is certainly possible that the jury could have felt sympathy for Cooper, just as any jury could feel sympathy for the innocent victim of a homicide. That is the reason why jurors are routinely instructed, as was done in this case, that they must not allow sympathy or prejudice to influence their verdict. Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict. *State v. McPherson,* 266 Neb. 715, 668 N.W.2d 488 (2003); *State v. Harrold,* 256 Neb. 829, 593 N.W.2d 299 (1999). We conclude from the entire record that the verdict was surely unattributable to the erroneously received testimony of Ellen, and the error was therefore harmless.

### *(iii) Attendance at Trial*

The remaining assignment of error with respect to Ellen is that the trial court erred in allowing her to be present in the courtroom after her testimony was concluded. This assignment, however, is not argued in Iromuanya's brief. Errors that are assigned but not argued will not be addressed by an appellate

court. *State v. Conover*, 270 Neb. 446, 703 N.W.2d 898 (2005); *State v. Marshall*, 269 Neb. 56, 690 N.W.2d 593 (2005).

### 3. "MEMORIAL BUTTONS" WORN BY SPECTATORS

#### (a) Additional Facts

The record reflects that jury selection lasted 2 days. Prior to the resumption of voir dire examination on the second day, and out of the presence of the prospective jurors, Iromuanya's counsel informed the court:

> I think some of the family [are] starting to wear buttons with Jenna Cooper's face or photo or something like that. . . . So, I am going to move in limine that we exclude all nice buttons or stuff like that, or with Lucky Iromuanya's or Nolan Jenkins' picture on them. The jury is going to be coming in and seeing this stuff pretty quickly.

The prosecutor commented that he did not notice anything, "but I didn't talk to them this morning." When the court asked who was wearing a button, Iromuanya's counsel stated, "I thought the lady that was just talking." The prosecutor replied, "She has an overcoat and I think she's taken her overcoat off." The court then asked to see counsel in chambers, but we are presented with no verbatim record of that conference. When the verbatim record resumed, Iromuanya's counsel made the following statement:

> Your Honor, as I was walking out, I noticed that at least one, I believe, family member of Jenna Cooper's has some buttons on her coat. I am moving in limine to exclude those buttons . . . .
>
> Again, for the record, as I was walking out, I believe a female lady in the gallery has a coat with a couple of pictures. I believe that to be Jenna Cooper, I didn't look real close. Then, once we took a break, apparently she went outside, was around the jury again, walked back in with her coat on, so those buttons were visible.

When asked for case law in support of his position, Iromuanya stated:

> I don't have any case law, except if it continues, if we're heading down this direction, at some point if there's an influence on the jury, yes, there's going to be a mistrial. But, do I have any specific case law as to buttons? No, but

> I can find case law that when sympathy overcomes the jury or anybody tries to persuade the jury, that's a mistrial.

Iromuanya did not move for a mistrial on these grounds during the trial. The court took the oral motion in limine under advisement, but the record does not reflect a ruling on the motion.

In his motion for new trial and a supporting affidavit received over the State's objection, Iromuanya's counsel stated that he recalled that "it was not until the third day of trial after the entire panel had been exposed to this inadmissible evidence that the Court requested visitors not wear these memorials in the Courtroom." In denying the motion for new trial, the trial court stated: "There is no evidence before the court that any juror ever saw any of these 'buttons' or that any juror was influenced in any way by any button."

### (b) Standard of Review

The responsibility for conducting a trial in an orderly and proper manner for the purpose of ensuring a fair and impartial trial rests with the trial court, and its rulings in this regard will be reviewed for an abuse of discretion. See *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990).

### (c) Resolution

The colloquy between the trial court and counsel regarding the wearing of buttons by spectators occurred during the jury selection proceedings, before the jury was sworn and presentation of evidence began. Because the record does not reflect the court's ruling on the oral motion in limine, we are unable to review it. It is incumbent upon the appellant to present a record which supports the errors assigned. *State v. Taylor*, 262 Neb. 639, 634 N.W.2d 744 (2001). Absent such a record, as a general rule, the decision of the lower court as to those errors is to be affirmed. *State v. Quintana*, 261 Neb. 38, 621 N.W.2d 121 (2001).

Although defense counsel indicated during jury selection that the wearing of buttons could lead to a mistrial, no such motion was filed during the trial. When a party has knowledge during trial of irregularity or misconduct, the party must timely assert his or her right to a mistrial. One may not waive an error, gamble on a favorable result, and, upon obtaining an unfavorable

result, assert the previously waived error. *State v. Hudson*, 268 Neb. 151, 680 N.W.2d 603 (2004); *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994).

The inadequacy of the record to support this assignment of error is illustrated by comparison to *Musladin v. Lamarque*, 427 F.3d 653 (9th Cir. 2005), *cert. granted sub nom. Carey, Warden v. Musladin*, 547 U.S. 1069, 126 S. Ct. 1769, 164 L. Ed. 2d 515 (2006), the single case cited by Iromuanya in support of his argument. *Musladin* involved a murder prosecution in which the defendant contended he killed the victim in self-defense. There was evidence that on each day of the 14-day trial, at least three members of the victim's family sat in the front row of the gallery, directly behind the prosecution and in clear view of the jury, wearing buttons several inches in diameter displaying a photograph of the victim. The trial court denied a defense request to instruct the spectators to refrain from wearing the buttons. A divided panel of the Ninth Circuit Court of Appeals held that the defendant was entitled to a writ of habeas corpus because the wearing of the buttons created an unacceptable risk that impermissible factors came into play, which was inherently prejudicial. See *Estelle v. Williams*, 425 U.S. 501, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976).

In contrast to the detailed evidence of spectators wearing buttons in *Musladin*, the record in this case gives us little information on which to evaluate Iromuanya's assigned error. We do not know how many spectators wore buttons, where they were seated in the courtroom, the size and specific content of the buttons, or the precise nature of the trial court's ruling with respect to the oral motion made by Iromuanya's counsel. From the scant record before us, we cannot conclude that the trial court abused its discretion with respect to the wearing of buttons by spectators.

### 4. JURY INSTRUCTIONS

#### (a) Additional Facts

Iromuanya's counsel objected to the district court's proposed jury instruction regarding intent because of the following language included in the instruction: "You may infer, but are not required to infer, that a person intended a reasonably probable

result of his or her act." The objection was overruled, and the instruction was given to the jury as instruction No. 8.

At the instruction conference, Iromuanya's counsel presented a proposed instruction asserting Iromuanya's position that his acts made him guilty of "involuntary manslaughter, not murder and attempted murder," and further stating:

> Unless you are convinced beyond a reasonable doubt that this is false, you must find [Iromuanya] not guilty of the attempted murder and murder charges. If a reasonable doubt exists whether Lucky Iromuanya intended anything short of killing Nolan Jenkins, then you must find [Iromuanya] not guilty of attempted murder and murder[.]

The district court declined to give the proposed instruction, noting that its content was included in other instructions given. Iromuanya's counsel also requested that the court instruct the jury that malice is an element of second degree murder, and the court denied the request. Iromuanya's counsel further submitted a proposed self-defense instruction, which the district court declined to give.

### (b) Standard of Review

 Whether jury instructions given by a trial court are correct is a question of law. When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below. *State v. Sanders*, 269 Neb. 895, 697 N.W.2d 657 (2005). In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *State v. Grosshans*, 270 Neb. 660, 707 N.W.2d 405 (2005); *State v. Anderson*, 269 Neb. 365, 693 N.W.2d 267 (2005).

 To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Mason*, 271 Neb. 16, 709 N.W.2d 638 (2006); *State v. Wisinski*, 268 Neb. 778, 688 N.W.2d 586 (2004).

### (c) Resolution

### (i) Instruction No. 8

The first paragraph of instruction No. 8 instructed the jury as follows: "Intent is an element of the crimes charged against the defendant. In deciding whether the defendant acted with intent, you should consider his words and acts and all of the surrounding circumstances." This language tracks that of NJI2d Crim. 5.1. However, the pattern instruction does not include the second paragraph of instruction No. 8, regarding the permissive inference that a person intends the reasonably probable result of an act, to which Iromuanya objected and has now assigned error.

This court has held that "[f]rom circumstances around a defendant's voluntary and willful act, a finder of fact may infer that the defendant intended a reasonably probable result of his or her act." *State v. Keup*, 265 Neb. 96, 109, 655 N.W.2d 25, 36 (2003). Thus, intent to kill may be inferred from deliberate use of a deadly weapon in a manner reasonably likely to cause death. *State v. Rokus*, 240 Neb. 613, 483 N.W.2d 149 (1992). See *State v. Keup, supra*. Iromuanya correctly points out that our holding in *Rokus* was in the context of determining the sufficiency of the evidence to support a conviction for second degree murder, and the same is true of the holding in *Keup*. While Iromuanya does not contend that the language in question is an incorrect statement of the law, he argues that its inclusion in the jury instruction was prejudicial because it allowed jurors "to infer that since Iromuanya said he pulled the trigger, and the consequence was hitting Jenkins in the head, he intended that result." Brief for appellant at 38.

In reaching the holding in *Rokus* that intent may be inferred from deliberate use of a deadly weapon in a manner reasonably likely to cause death, this court relied in part upon *United States v. Kimmel*, 777 F.2d 290, 292 (5th Cir. 1985), in which the court approved the following jury instruction:

> "As a general rule it is reasonable to infer that a person ordinarily intends the natural and probable consequences of his knowing acts. The jury may draw the inference that the accused intended all the consequences which one standing in like circumstances and possessing his knowledge should reasonably have expected to result from any act of conscious

omission and any such inference drawn is entitled to be considered by the jury in determining whether or not the government has proved beyond a reasonable doubt that the defendant did possess the required intent."

The court reasoned that because the instruction permitted but did not require an inference of intent, it did not have the constitutionally impermissible effect of relieving the government of its burden to prove intent as an element of the crime.

Similarly, in this case, the challenged instruction stated a permissive inference which could be drawn from Iromuanya's admittedly knowing and intentional act of firing the handgun. The jury was presented with two versions of what occurred: Iromuanya's statement to police that he "shot by him" with the intent of scaring, but not killing, Jenkins and testimony from other witnesses that Iromuanya pointed the weapon in Jenkins' direction before firing. The challenged portion of instruction No. 8 did not preclude the jury from considering and accepting Iromuanya's version of the shooting. Rather, it correctly informed the jury that if it found that Iromuanya pointed the weapon at Jenkins and fired, it *could* infer an intent to kill despite the fact that such intent was not expressly stated.

Jury instructions must be read as a whole, and if they fairly present the law so that the jury could not be misled, there is no prejudicial error. *State v. Williams*, 269 Neb. 917, 697 N.W.2d 273 (2005); *State v. Anderson*, 269 Neb. 365, 693 N.W.2d 267 (2005); *State v. Weaver*, 267 Neb. 826, 677 N.W.2d 502 (2004). In this case, instruction No. 3 clearly informed the jury that the intent element with respect to the charge of attempted murder of Jenkins meant the intent to "cause the death of Nolan Jenkins." Instruction No. 5 informed the jury that the intent element with respect to the charged murder of Cooper was the intent to kill. Further, instruction No. 7 informed the jury of the doctrine of transferred intent and specifically stated that if it found Iromuanya "intended to kill Nolan Jenkins," the element of intent was satisfied as to Cooper even if he did not "intend to kill" her. The first sentence of instruction No. 8 informed the jury that in determining whether Iromuanya acted with the requisite intent, it should consider "his words and acts and all of the surrounding circumstances." We conclude that the permissive

inference language in instruction No. 8 was a correct statement of the law which did not prejudice Iromuanya.

### (ii) Requested "Theory of Defense" Instruction

It is not error for a trial court to refuse to give a party's requested instruction where the substance of the requested instruction was covered in the instructions given. *State v. Mason*, 271 Neb. 16, 709 N.W.2d 638 (2006); *State v. Gales*, 269 Neb. 443, 694 N.W.2d 124 (2005). If there is evidence to support it, a defendant is entitled to have an instruction given on his theory of the case. See *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984). However, such an instruction is not needed where other instructions adequately cover the defense theory. *State v. Fitzgerald*, 1 Neb. App. 315, 493 N.W.2d 357 (1992).

The instructions given by the court in this case included an instruction on manslaughter as a lesser-included offense of second degree murder and repeatedly informed the jury of the State's burden to prove guilt beyond a reasonable doubt. We conclude that the instructions given by the court adequately covered all pertinent matters included in Iromuanya's proposed "theory of defense" instruction.

Based on *People v Lester*, 406 Mich. 252, 277 N.W.2d 633 (1979), Iromuanya argues that he was nevertheless entitled to a separate instruction on his theory of defense. In *Lester*, the Michigan Supreme Court held that a separate instruction on accidental homicide was mandated whenever the defense requested an instruction on the theory and there was evidence to support it, arguably even if the jury instructions given implicitly covered the theory. Notably, however, *Lester* has been overruled, and Michigan now applies a harmless error analysis when reviewing a failure to give an accidental homicide instruction. *People v. Hawthorne*, 474 Mich. 174, 713 N.W.2d 724 (2006). We have taken a similar approach. In *State v. Brown*, 220 Neb. 849, 374 N.W.2d 28 (1985), we stated that a separate accidental homicide instruction was not necessary when the intent instruction given to the jury adequately covered the issue. Thus, even if the proposed theory of the case instruction offered by Iromuanya was an attempt to help the jury distinguish between intent and accident, in this case, the jury was clearly instructed

that "[i]ntentionally" meant "willfully or purposely, not accidentally or involuntarily."

For these reasons, we conclude that the district court did not err in refusing to give Iromuanya's proposed instruction stating his theory of defense.

### (iii) Requested Malice and Self-Defense Instructions

Iromuanya argues that the district court erred in failing to either instruct the jury on malice as an element of second degree murder or give his requested self-defense instruction. Malice is not an element of second degree murder, and the district court therefore did not err in refusing to instruct that it was. Neb. Rev. Stat. § 28-304(1) (Reissue 1995); *State v. Davlin*, 263 Neb. 283, 639 N.W.2d 631 (2002); *State v. Redmond*, 262 Neb. 411, 631 N.W.2d 501 (2001); *State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998).

In *Burlison*, we overruled prior cases which held that malice was an essential element of second degree murder. Iromuanya's argument that he was entitled to a self-defense instruction if the court declined to instruct on malice as an element is based on the following language in *Burlison*:

> We are now persuaded that when read in conjunction with Neb. Rev. Stat. § 28-102(1) (Reissue 1995), which defines the general purpose of the criminal code as "[t]o forbid and prevent conduct that unjustifiably and inexcusably inflicts or threatens substantial harm to individual or public interests," and the provisions of Neb. Rev. Stat. §§ 28-1406 to 28-1413 (Reissue 1995) dealing with justification for use of force, the Legislature's definition of second degree murder set forth in § 28-304(1) is not unconstitutionally overbroad. See *State v. Ryan, supra* (Gerrard, J., dissenting). Likewise, we are satisfied that in this context the statutes dealing with justification for use of force do not impose upon a defendant an unconstitutional shifting of the burden of proof, but, rather, a constitutionally permissible allocation of the burden of production, which when met by anything more than a scintilla of evidence requires the State to prove the lack of justification beyond a reasonable doubt.

255 Neb. at 196-97, 583 N.W.2d at 36. Prior and subsequent to *Burlison*, we have stated that a trial court must instruct the jury

on the issue of self-defense when there is "any evidence" adduced which raises a "legally cognizable" claim of self-defense. E.g., *State v. Faust*, 265 Neb. 845, 660 N.W.2d 844 (2003); *State v. Urbano*, 256 Neb. 194, 589 N.W.2d 144 (1999); *State v. Marshall*, 253 Neb. 676, 573 N.W.2d 406 (1998); *State v. Kinser*, 252 Neb. 600, 567 N.W.2d 287 (1997). We apply that standard here.

Self-defense is a statutorily affirmative defense in Nebraska. *State v. Owens*, 257 Neb. 832, 601 N.W.2d 231 (1999). Neb. Rev. Stat. § 28-1409 (Reissue 1995) provides in pertinent part:

(1) . . . [T]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

. . . .

(4) The use of deadly force shall not be justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily harm, kidnapping or sexual intercourse compelled by force or threat, nor is it justifiable if:

. . . .

(b) The actor knows that he can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserting a right thereto or by complying with a demand that he abstain from any action which he has no duty to take . . . .

Neb. Rev. Stat. § 28-1406(3) (Reissue 1995) defines "[d]eadly force" as

force which the actor uses with the purpose of causing or which he knows to create a substantial risk of causing death or serious bodily harm. Purposely firing a firearm in the direction of another person or at a vehicle in which another person is believed to be constitutes deadly force.

To successfully assert the claim of self-defense, one must have a reasonable and good faith belief in the necessity of using force. In addition, the force used in defense must be immediately necessary and must be justified under the circumstances. *State v. Faust, supra*; *State v. Urbano, supra*.

■ There is no evidence in the record to support a reasonable and good faith belief that Iromuanya was threatened with death or serious bodily harm at the time he fired the handgun. An instruction that no one was to leave until the shot glasses were retrieved cannot support an inference of such a threat. Several minutes had passed after the initial confrontation with Jenkins, which was broken up after a few seconds with no use of deadly force by anyone. Assuming the truth of Iromuanya's statement to police that when Jenkins approached a second time, he asked if Iromuanya was the person who had punched him previously, we conclude that neither that statement nor any other circumstance reflected in the record would warrant a reasonable or good faith belief in the necessity of using deadly force. There is no evidence that anyone, other than Iromuanya, was in possession of a deadly weapon. If the trial evidence does not support a claim of self-defense, the jury should not be instructed on it. *State v. Faust*, 265 Neb. 845, 660 N.W.2d 844 (2003); *State v. Urbano*, 256 Neb. 194, 589 N.W.2d 144 (1999). Because there was no evidence to support a claim of self-defense in this case, the district court did not err in refusing to give the requested instruction.

## 5. SUFFICIENCY OF EVIDENCE

### (a) Standard of Review

■ When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Aldaco*, 271 Neb. 160, 710 N.W.2d 101 (2006); *State v. Muro*, 269 Neb. 703, 695 N.W.2d 425 (2005).

### (b) Resolution

Our standard of review as stated above requires substantial deference to the factual findings made by the jury. As an appellate court, we do not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, as such matters are for the finder of fact. See *State v. Sanders*, 269 Neb. 895, 697 N.W.2d 657 (2005).

Iromuanya was charged with and convicted of one count of attempted second degree murder, one count of second degree

murder, and two counts of using a weapon to commit a felony. A person commits murder in the second degree if he causes the death of a person intentionally, but without premeditation. § 28-304(1). Murder in the second degree is a Class 1B felony. § 28-304(2). A person is guilty of an attempt to commit a crime if he or she intentionally "engages in conduct which, under the circumstances as he or she believes them to be, constitutes a substantial step in a course of conduct intended to culminate in his or her commission of the crime." Neb. Rev. Stat. § 28-201(1)(b) (Cum. Supp. 2004). Criminal attempt is a Class II felony when the crime attempted is a Class I, Class IA, or Class IB felony. § 28-201(4)(a). Any person who uses a firearm to commit any felony which may be prosecuted in a court of this state commits the offense of using a deadly weapon to commit a felony. Neb. Rev. Stat. § 28-1205(1) (Reissue 1995). Use of a deadly weapon which is a firearm to commit a felony is a Class II felony. § 28-1205(2)(b).

As we have noted, it is undisputed that Iromuanya intentionally fired the shot which injured Jenkins and killed Cooper. Viewed in a light most favorable to the prosecution, the circumstantial evidence is sufficient to establish that he did so with the intent of killing Jenkins. The evidence thus supports the conviction of attempted second degree murder and, under the doctrine of transferred intent, the conviction of second degree murder. See *State v. Morrow*, 237 Neb. 653, 467 N.W.2d 63 (1991) (holding evidence sufficient to support second degree murder conviction where defendant pointed gun at neck of person with whom he had exchanged angry words, fired and missed, but hit and killed another person). Because a firearm was used to commit both of these crimes, the evidence is also sufficient to support the convictions on two counts of use of a weapon to commit a felony.

There is no merit to Iromuanya's argument that the evidence was insufficient to support his convictions.

### 6. Sentencing Issues

#### (a) Additional Facts

At the sentencing hearing, Iromuanya objected to various documents included in the presentence investigation report

(PSI), which documents he characterized as "character letters" regarding Cooper. The court sustained the objection and stated it would only consider those portions of the PSI that "appropriately should be considered by the Court with respect to victim impact statements." After allocution and immediately prior to pronouncing sentence, the court made the following statement on the record:

> [T]his is a tragic case. It's a tragedy for the family and friends of Jenna Cooper, and for Nolan Jenkins, his family and his friends. And as in any murder case, whenever someone is murdered, there is a sense of loss for parents, brothers, relatives and friends, and that loss is immense. And when someone is shot and seriously injured, it has a significant emotional impact on the victim, their family, their friends, I recognize that.

> I also recognize that this is a tragedy for . . . Iromuanya's family and his friends. And I certainly consider [Iromuanya's] lack of any real significant criminal history. However, in determining the appropriate sentence, this Court must consider all of the surrounding facts and circumstances of these crimes.

> The jury determined that you intentionally tried to kill Nolan Jenkins, and the jury found you guilty of the murder of Jenna Cooper. You brought a gun with you. No one there had a gun that evening. No one had any type of a weapon that evening, except for you. It was your anger that caused you to pull that gun out of your pocket and you shot that gun in anger.

> In determining the appropriate sentence, this Court must consider the protection of the public, and I cannot ignore that you shot someone, simply because they pushed you and made you angry. I also must impose a sentence that will not depreciate the seriousness of these crimes.

The sentencing range for attempted murder in the second degree, a Class II felony, is a minimum of 1 year's imprisonment and a maximum of 50 years' imprisonment. Neb. Rev. Stat. § 28-105(1) (Cum. Supp. 2004) and §§ 28-201(4)(a) and 28-304(2). The court sentenced Iromuanya to imprisonment for

25 to 35 years on this conviction, charged in the information as count I. The sentencing range for use of a weapon which is a firearm to commit a felony, a Class II felony, is a minimum of 1 year's imprisonment and a maximum of 50 years' imprisonment. §§ 28-105(1) and 28-1205(2)(b). The court sentenced Iromuanya to imprisonment for a period of 10 to 20 years on the weapons conviction related to the attempted second degree murder conviction, charged in the information as count II. The sentencing range for murder in the second degree, a Class IB felony, is a minimum of 20 years' imprisonment and a maximum of life imprisonment. §§ 28-105(1) and 28-304(2). The court sentenced Iromuanya to "not less than life imprisonment nor more than life imprisonment" on the second degree murder conviction, charged in the information as count III. On the separate weapons conviction relating to the second degree murder conviction, charged as count IV of the information, the court sentenced Iromuanya to imprisonment for a period of 10 to 20 years. The court further ordered that the sentence on count II is to run consecutively to count I, the sentence on count III is to run consecutively to counts I and II, and the sentence on count IV is to run consecutively to counts I, II, and III. Iromuanya was given credit for time served.

### (b) Standard of Review

A determination of whether multiple convictions in a single trial lead to multiple punishments depends on whether the Legislature, when designating the criminal statutory scheme, intended that cumulative sentences be applied for conviction on such offenses. *State v. Spurgin*, 261 Neb. 427, 623 N.W.2d 644 (2001).

Sentences within statutory limits will be disturbed by an appellate court only if the sentences complained of were an abuse of judicial discretion. *State v. Thomas*, 268 Neb. 570, 685 N.W.2d 69 (2004); *State v. Weaver*, 267 Neb. 826, 677 N.W.2d 502 (2004). An abuse of discretion in imposing a sentence occurs when a sentencing court's reasons or rulings are clearly untenable and unfairly deprive the litigant of a substantial right and a just result. *State v. Sanders*, 269 Neb. 895, 697 N.W.2d 657 (2005).

### (c) Resolution

#### (i) Multiple Punishments for Use of Weapon

Iromuanya argues that by imposing separate, consecutive sentences for the convictions of use of a weapon to commit a felony, the district court imposed multiple punishments for the same act in that both counts stemmed from the single shot that he fired. A similar issue was addressed in *State v. Trevino*, 230 Neb. 494, 432 N.W.2d 503 (1988), in which the defendant opened fire on a group of people, causing serious injury to Mark Heil. The defendant was found guilty of attempted second degree murder and the use of a firearm to commit that felony in connection with the injury to Heil. In a second prosecution, consolidated with the first for trial, the defendant was also convicted of first degree assault upon Heil and use of a firearm in the commission of that felony.

In his appeal from two consolidated cases, the defendant alleged that the two convictions for the use of a firearm against Heil offended the Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution because they amounted to multiple punishments for the same conduct. In rejecting this contention, this court applied the principle that where a legislature specifically authorizes cumulative punishments under two statutes proscribing the same conduct, the prosecution may, in a single trial, seek and the court may impose such cumulative punishments without offending the Double Jeopardy Clause. *State v. Trevino, supra*, citing *Missouri v. Hunter*, 459 U.S. 359, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983). We noted that under the Nebraska statute defining the offense of use of a weapon to commit a felony, the offense was to be " 'treated as a separate and distinct offense from the felony being committed' " and that the sentence " 'shall be consecutive to any other sentence imposed.' " *State v. Trevino*, 230 Neb. at 521, 432 N.W.2d at 521, quoting § 28-1205(3) (Reissue 1985). We concluded that because the defendant was found guilty of two distinct predicate offenses, attempted second degree murder and first degree assault, the trial court did not err in imposing consecutive sentences on the two corresponding convictions for use of a weapon to commit a felony. A dissent took the position that Nebraska law does not authorize cumulative punishment for attempted

murder and assault where both offenses arise from the same conduct, and the dissent concluded that the assault and corresponding firearm convictions should have been reversed and dismissed.

Nebraska law clearly authorizes cumulative punishments for the attempted second degree murder of Jenkins and the second degree murder of Cooper. Thus, when he fired the handgun, Iromuanya committed two predicate offenses. The language of § 28-1205 is the same today as it was at the time *Trevino* was decided. Because a firearm was used to commit each predicate offense, the district court properly found that there were two separate and distinct offenses of use of a weapon to commit a felony, and the court properly imposed consecutive sentences for each count.

Iromuanya's multiple punishments argument also relies on *State v. Pruett*, 263 Neb. 99, 638 N.W.2d 809 (2002), in which we reiterated our statement in *State v. Ring*, 233 Neb. 720, 447 N.W.2d 908 (1989), that the Legislature's purpose in creating a separate offense of using a weapon in the commission of a felony was to "discourage individuals from carrying deadly weapons while they commit felonies." *State v. Pruett*, 263 Neb. at 105, 638 N.W.2d at 815. In both *Pruett* and *Ring*, we held that an unintentional crime could not serve as the predicate felony for a weapons charge under § 28-1205. In this case, however, intent is an essential element of both of the predicate felonies of which Iromuanya was convicted. Accordingly, we find no merit in the argument that his conviction on the two weapons counts amounted to impermissible multiple punishments.

### (ii) Excessive Sentences

The sentences imposed by the district court fell within the statutory sentencing limits for each of the four offenses of which Iromuanya was convicted. Accordingly, we review the sentences for abuse of discretion. *State v. Thomas*, 268 Neb. 570, 685 N.W.2d 69 (2004); *State v. Weaver*, 267 Neb. 826, 677 N.W.2d 502 (2004). Although Iromuanya generally contends that all of his sentences were excessive, his argument focuses exclusively on the maximum sentence he received on the second degree murder conviction. He argues that the trial court placed undue

weight on letters and materials received from Cooper's family and friends urging a maximum sentence, while disregarding materials submitted on his behalf arguing for leniency.

As noted, Iromuanya's counsel objected to a "majority of the letters that were sent on behalf of Jenna Cooper and Nolan Jenkins" included in the PSI. The court sustained the objection, stating that it would only consider portions of the PSI that "appropriately should be considered by the Court with respect to victim impact statements." In this regard, we have stated that a judge should take into account facts obtained from victim impact statements in imposing a sentence, as he or she should consider all facts pertinent to sentencing, but a judge must not and cannot allow the judgments and conclusions of the victim's family to be substituted for those of the court in imposing a sentence. See *State v. Carlson*, 225 Neb. 490, 406 N.W.2d 139 (1987). After sustaining the objection, the court asked defense counsel if he was requesting that other materials be removed from the PSI, and defense counsel replied that removal was not necessary. Thus, it is unclear which portions of the voluminous PSI were actually considered by the sentencing court. However, unlike *Carlson*, we cannot conclude from this record that the court improperly relied on demands for a severe sentence made on behalf of the victims.

Factors a judge should consider in imposing a sentence include the defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or law-abiding conduct, and motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime. *State v. Aldaco*, 271 Neb. 160, 710 N.W.2d 101 (2006); *State v. Griffin*, 270 Neb. 578, 705 N.W.2d 51 (2005). In considering a sentence, a court is not limited in its discretion to any mathematically applied set of factors. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing court's observations of the defendant's demeanor and attitude and all of the facts and circumstances surrounding the defendant's life. *Id.*

Iromuanya was 23 years old at the time of his crimes. Although his parents were born in Nigeria, he was born and was raised in Lincoln. He has four siblings. He was never married, but had a steady relationship and three dependent children. He

completed high school and attended 1 year of community college. He had been unemployed since July 2003. He reported moderate use of alcohol and a single experimentation with marijuana at the age of 17. He denied use or experimentation with chemical substances other than marijuana. Testing results included in the PSI reflect a "low risk" for violence and aggressiveness, but a "problem risk" for "stress coping."

As specifically noted by the sentencing court, Iromuanya had no significant criminal history. In 1998, he was fined $50 and costs for having no operator's license and a charge of not having proof of insurance was dismissed. In 1999, he was fined $25 for trespassing. In 2001, he was fined $25 for failure to appear and a charge of disturbing the peace was dismissed.

The motivation for his offenses seems apparent from the record. When Ingram announced that no one was to leave until the shot glasses were recovered and Jenkins physically confronted Iromuanya and asked him if he had taken the shot glasses, Iromuanya felt wrongly accused and reacted with anger directed primarily at Jenkins. His anger, perhaps initially justified, explains but does not excuse his subsequent violent act in firing the handgun at Jenkins.

All four of Iromuanya's crimes resulted from the same act. The indeterminate sentences imposed on the attempted murder and weapons counts fall generally near the midpoint of the statutory sentencing ranges, with the minimum term of each sentence set below the maximum term. Based on the relevant sentencing factors outlined above, particularly those articulated by the district court, these sentences do not constitute an abuse of discretion and are not excessive.

The sentence of not less than life imprisonment nor more than life imprisonment imposed for the second degree murder conviction is at the very top of the range permitted by statute and was ordered to run consecutively to the sentences for attempted murder and the related weapons charges. At the sentencing hearing, the court explained that it must consider the protection of the public and must also impose a sentence that would not depreciate the seriousness of the crimes. Those are, of course, valid general considerations which were applicable to sentencing on all four counts.

We find no abuse of discretion in setting life imprisonment as the maximum term of the second degree murder sentence. Iromuanya arrived at the party carrying a loaded, concealed handgun and used it without justification to extinguish a life. The shooting was a senseless act of violence, and the imposition of the maximum term of life imprisonment properly reflected the seriousness of the criminal conduct and its consequences.

However, the minimum term of Iromuanya's indeterminate sentence, which is the term used to calculate parole eligibility, was also set at life imprisonment. See Neb. Rev. Stat. § 83-1,110 (Cum. Supp. 2004). The court could not have imposed a more severe minimum term for second degree murder on a hardened criminal with a lengthy history of violent felony convictions. A sentence should fit the offender and not merely the crime. *State v. Harrison*, 255 Neb. 990, 588 N.W.2d 556 (1999), citing *Williams v. New York*, 337 U.S. 241, 69 S. Ct. 1079, 93 L. Ed. 1337 (1949). The record contains no basis upon which we can discern why the minimum term of the sentence for second degree murder was the same as the maximum term, while the minimum terms of the sentences imposed for the other three crimes resulting from the same act were not. Taking into account all of the relevant circumstances, including but not limited to the fact that Iromuanya had no significant criminal record or history of violence, we conclude that the district court abused its discretion in setting life imprisonment as the minimum term of the sentence for second degree murder and that to that extent, the sentence was excessive. As noted, we find no abuse of discretion in sentencing on the other three counts.

Neb. Rev. Stat. § 29-2308 (Reissue 1995) provides in pertinent part that in criminal appeals brought in this court or the Nebraska Court of Appeals,

the appellate court may reduce the sentence rendered by the district court against the accused when in its opinion the sentence is excessive, and it shall be the duty of the appellate court to render such sentence against the accused as in its opinion may be warranted by the evidence.

See, also, *State v. Etchison*, 188 Neb. 134, 195 N.W.2d 498 (1972); *State v. Oldenburg*, 10 Neb. App. 104, 628 N.W.2d 278 (2001). Based upon our statutory authority, we reduce Iromuanya's

sentence on count III, murder in the second degree, to imprisonment for not less than 50 years nor more than life. We further conclude that this sentence should run concurrently with the sentence of 25 to 35 years' imprisonment on count I, attempted murder in the second degree, which we affirm, inasmuch as both offenses resulted from the same act. We also affirm the sentences of 10 to 20 years' imprisonment each on counts II and IV, use of a weapon to commit a felony, and order that such sentences are to be served consecutively to the sentences on counts I and III, and to each other, as required by § 28-1205(3).

## IV. CONCLUSION

For the reasons discussed herein, we affirm Iromuanya's convictions on all four counts. We also affirm the sentences on counts I, II, and IV. We conclude that the sentence imposed by the district court of not less than life imprisonment nor more than life imprisonment on count III, murder in the second degree, is excessive, and we modify that sentence to not less than 50 years' imprisonment nor more than life imprisonment, with the sentence on count III to be served concurrently with the sentence on count I. The sentences of 10 to 20 years' imprisonment on counts II and IV shall be served consecutively to the sentences on counts I and III, and to each other. Iromuanya shall receive credit for 305 days served, as ordered by the district court.

AFFIRMED AS MODIFIED.

WRIGHT, J., not participating.

CONNOLLY, J., concurring.

I join the majority opinion. I am, however, prompted to comment regarding how the trial court handled the issue of the spectators' wearing "memorial buttons." It is correct that we have a scanty record as to whether the "memorial buttons" affected the jury. However, this problem could have been easily averted. In this emotionally charged trial, the trial judge, at the first whiff of a problem, should have immediately smothered any incident that could have potentially prejudiced a jury.

It is the duty of a trial court to see that defendants in criminal cases are tried by a jury such that not even the suspicion of bias or prejudice can attach to any member thereof. *State v. Polinski*, 230 Neb. 43, 429 N.W.2d 725 (1988). "[C]ertain practices pose

such a threat to the 'fairness of the factfinding process' that they must be subjected to 'close judicial scrutiny.' " *Holbrook v. Flynn*, 475 U.S. 560, 568, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986).

Here, defense counsel informed the court on the second day of voir dire of a potential problem and moved in limine to exclude the buttons. Defense counsel stated at that time that "some of the family [are] starting to wear buttons with Jenna Cooper's face or photo . . . ." In response to the court's question, defendant's counsel also stated that he had seen at least one woman wearing buttons that morning. According to defense counsel's affidavit, submitted in support of Iromuanya's motion for new trial, the buttons included some type of slogan. The court's request of defense counsel for case law on the issue was wholly inadequate to address any potential prejudice. After being informed by counsel that family members were starting to wear the buttons, the court had a duty to immediately determine—out of the presence of the jury—who, if anyone, was wearing the buttons, and the message, if any, the buttons conveyed. Had the court appropriately reacted to the first indication of a potential problem, we would either not be dealing with this issue on appeal or have a sufficient record for review. Instead, after 2 days of trial, according to defense counsel's affidavit, the court requested that spectators not wear the memorial buttons. In many cases, this will be too little, too late—the infection will have already spread.

HENDRY, C.J., concurring in part, and in part dissenting.

I respectfully dissent from that portion of the opinion which modifies the sentence on count III, murder in the second degree, for which the district court sentenced Iromuanya to "not less than life imprisonment nor more than life imprisonment."

In considering a sentence, the sentencing court is not limited in its discretion to any mathematically applied set of factors. *State v. Weaver*, 267 Neb. 826, 677 N.W.2d 502 (2004). The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observations of the defendant's demeanor and attitude and all of the facts and circumstances surrounding the defendant's life. *State v. Worm*, 268 Neb. 74, 680 N.W.2d 151 (2004).

It is true that the district court found that Iromuanya had no significant criminal history, but, as the majority notes, Iromuanya

brought a loaded, concealed handgun to the party. The gun was intentionally used in a senseless act of violence, resulting in the shooting of Nolan Jenkins in the head and Jenna Cooper's death. Regardless of whether this court would have imposed a sentence of life imprisonment for the minimum term of an indeterminate sentence under the same or similar circumstances, I cannot conclude that the sentencing court's reasons for the sentence, inter alia, protection of the public and imposition of a sentence that does not depreciate the seriousness of the crime, are clearly untenable and deprive Iromuanya of a substantial right and just result. See *State v. Sanders*, 269 Neb. 895, 697 N.W.2d 657 (2005). I would find no abuse of discretion and affirm Iromuanya's original sentence on count III.

In all other respects, I concur with the majority opinion.

GERRARD, J., joins in this concurrence and dissent.

MILLER-LERMAN, J., concurring in part, and in part dissenting.

I respectfully dissent from that portion of the opinion which modifies the sentence on count III, murder in the second degree. Whether or not I would have imposed the same sentence, under the facts and our jurisprudence, I do not find an abuse of discretion.

In all other respects, I concur with the majority opinion.